UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
HERMAN LEBOWITZ, EKATERINA REZNIKOV,
and KEITH BLACK,

                              Plaintiffs,

                    -against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, JOHN O'MAHONEY, and LAURA IZZO
(individually and in their official capacities),

                              Defendants.
-------------------------------------------------------------------X

Docket No.: 15-CV-02890
(WFK)(VMS)

**SECOND AMENDED
COMPLAINT**

Jury Trial Demanded

    Plaintiffs, HERMAN LEBOWTITZ, EKATERINA REZNIKOV, and KEITH BLACK,

by and through their attorneys, WHITE, RICOTTA & MARKS, P.C., complaining of Defendants

herein, alleges, upon knowledge as to themselves and their own actions, and upon information and

belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983, to redress violations of Plaintiffs'

constitutional rights in the terms, conditions and privileges of employment of Plaintiffs' by the

Defendants, as well as deprivation by the Defendants, acting under color of law, of the policies,

ordinances, custom and usage of rights, privileges and immunities secured to the Plaintiffs by the

Fourteenth Amendment to the Constitution of the United States and all the laws and statutes

thereunder, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities

Act, 42 U.S.C. §12101, *et seq.*, Title VII of the Civil Rights Acts of 1964, New York State and

1

City Human Rights Laws, and any other cause of action which can be inferred from the facts set forth herein.

2.      The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, the doctrine of pendant jurisdiction and the aforementioned statutory and constitutional provisions.

3.      Venue is proper pursuant to 28 U.S.C. § 1391.

4.      All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") on or about June 25, 2014, November 7, 2014 and on December 2, 2014, for Herman Lebowitz, Ekaterina Reznikov and Keith Black respectively. In or around June 2014, a Notice of Claim was filed on behalf of each Plaintiff. The statutory time period has passed and Defendants have not attempted to resolve this matter. A notice of a right to sue letter was issued to Herman Lebowitz on February 19, 2015, to Keith Black on July 1, 2015, and to Ekaterina Reznikov on November 6, 2015. This action was properly situated within ninety (90) days of Herman Lebowitz's, Keith Black, and Ekaterina Reznikov's receipt of said notice.

## PARTIES

5.      At all times hereinafter mentioned, Plaintiff Herman Lebowitz ("Herman") was and still is a resident of Kings County, New York.

6.      At all times hereinafter mentioned, Plaintiff, Ekaterina Reznikov ("Kate"), was and still is a resident of Kings County, New York.

7.      At all times hereinafter mentioned, Plaintiff, Keith Black ("Black"), was and still is a resident of Kings County, New York.

2

8.      Defendant, New York City Department of Education ("DOE"), was and still is a New York City government entity, located at 52 Chambers Street, New York, NY 10007.

9.      Defendant, John O'Mahoney ("O'Mahoney"), is the principal at Sheepshead Bay High School ("Sheepshead Bay"), located at 3000 Avenue X, Brooklyn, New York 11235. O'Mahoney was and/or is responsible in participating in the hiring, firing, promotion and discipline of employees and other employment related issues. Additionally, O'Mahoney is charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. O'Mahoney has the power to make personnel decisions regarding Plaintiffs' employment.

10.     Defendant, Laura Izzo ("Izzo"), is the assistant principal of special education at Sheepshead Bay and is Kate's direct supervisor. Izzo was and/or is responsible in participating in the hiring, firing, promotion and discipline of employees and other employment related issues. Additionally, Izzo is charged with the responsibility of insuring that employees are not subjected to discriminatory and/or retaliatory practices. Izzo has the power to make personnel decisions regarding Plaintiffs' employment.

## FACTS

### *Herman Lebowitz*

11.     Herman is a fifty-seven (57) year old male, born on August 24, 1957.

12.     Herman began his employment with the DOE in September 1990 as a Mathematics Teacher. Herman has been employed as a Mathematics Teacher at Sheepshead Bay since September 2000.

3

13.     In or around December 2010, O'Mahoney became the Principal of Sheepshead Bay, and as such, became Herman's supervisor. Up to this point, Herman had an exemplary record of performance within the DOE, receiving all satisfactory observations and yearly reviews, and was never the subject of any discipline.

14.     From the outset of his supervision of Herman, and continuing through present date, O'Mahoney has engaged in a pattern of discrimination, harassment, and retaliation against Herman due to his age.

15.     In or about May 2012, O'Mahoney attempted to terminate a number of teachers over the age of forty (40), including Herman, even though these teachers had satisfactory ratings up until this point.

16.     In or about June 2012, as a result of an age discrimination complaint filed by his union, Herman was reinstated to his position as a teacher.

17.     The following school year, in or around October 2013, the assistant principal of Special Education, Izzo, who, upon information and belief, may be related to O'Mahoney, conducted an observation of Herman's class. Izzo, despite no background in math, gave Herman a poor evaluation without any basis in fact. Similarly situated teachers who were under the age of forty (40) or who did not complain about discrimination, did not receive poor evaluations without a factual basis.

18.     In or around December 2013, Izzo went on maternity leave. Before leaving, Izzo stated that she would take care of the younger teachers. Moreover, all the young teachers had keys to Izzo's room which had a Xerox machine and other supplies. No senior teacher had access or keys to enter her room.

19.     On or about March 7, 2014, O'Mahoney observed Herman and gave him a poor evaluation, rating his performance as ineffective in a number of areas. However, during the time that O'Mahoney observed Herman, Herman was not teaching a class, but was rather proctoring a test written by another teacher. As such, Herman was not able to teach or instruct the students in any way. As a result, Herman was evaluated poorly for following department orders exactly as directed.

20.     On or about March 10, 2014, O'Mahoney inspected Herman's classroom and asked to view Herman's "word wall," which O'Mahoney criticized him for not having during his March 7 evaluation. Herman showed him the wall, along with proof that the wall was up during the March 7 evaluation. O'Mahoney further criticized Herman for having out of date student work on the walls, incorrectly alleging that it was March 20, rather than March 10. When Herman brought these issues to O'Mahoney's attention, O'Mahoney still refused to change the ineffective ratings he gave to Herman, despite being made aware that they were based upon false and/or incorrect information. Similarly situated teachers who were under the age of forty (40) or who did not complain about discrimination, did not receive poor evaluations based upon false or incorrect information.

21.     On or about May 2, 2014, Izzo again observed Herman during his first period. O'Mahoney and Izzo consistently and regularly evaluate teachers over the age of forty (40) during their first period. This is done because the whistle to call the students up from breakfast is often late, causing students to be late for the class period. Teachers are then held responsible and penalized for the student lateness in their evaluations. Teachers who were under the age of forty (40) and who did not complain of discrimination were not routinely observed during their first period class, were

not penalized or held responsible for late students or even entirely absent classes. Many of these younger teachers were actually granted observation "do-overs" in Ms. Izzo's words, in which they could be observed again and not have the first observation count. This benefit was not afforded to Herman or his similarly situated coworkers that were over the age of forty.

22.     Since O'Mahoney became Principal, O'Mahoney and Izzo have given younger teachers advanced notice prior to O'Mahoney and/or Izzo conducting an informal observation of them. Informal Observations are supposed to be unannounced visits. Older teachers, including Herman, were not similarly advised by O'Mahoney or Izzo in advance as to when they would be conducting informal observations of the older teacher's classrooms.

23.     Moreover, throughout the course of his employment at Sheepshead Bay as a principal, O'Mahoney has terminated older teachers, subjected older teachers to unfound discipline, baseless ratings, and harassment, and generally hassled older teachers into retirement, while consistently replacing them with younger teachers. Teachers that were the target of O'Mahoney's harassment and discriminatory animus are Black, Reznikov, Mr. Cohen, Barry Martin, Alex Sinvinsky, John Cayton, Susan Crichlow, Mario Caggiano, Jay Appelblatt, Nataliya Shifrina, Kathleen Morgenlander, Shana Joseph, and Lois Rosenblatt.

24.     While Herman had a stellar record of performance prior to O'Mahoney's arrival, after O'Mahoney became principal, he began to issue negative observations and evaluations for Herman's performance, while not similarly treating Herman's younger co-workers, or those who did not complain of discrimination.

25.     On or about May 13, 2014, Herman was observed by Izzo. Izzo came five minutes late and failed to observe Herman instructing the children in their "Do Now" for the day, a key component

to the class for evaluation purposes. Izzo later misrepresented Herman's "Do Now" from his lesson plan to have comprised the entirety of his lesson for the day, based upon which she rated him overall ineffective for the student assessment category. Izzo also missed the vocabulary review portion of the class and yet gave him poor reviews for that portion of the evaluation as well.

26.     On or about May 21, 2014, Herman applied for a posted vacancy in integrated co-teaching ("ICT"), a class taught by both a regular education math teacher and a special education teacher. Herman was informed that he was granted the position and on or about June 24, 2014, he was given his program for the upcoming school year, indicating the new position.

27.     At the start of the 2014-2015 school year, it was revealed through a list of teachers on an email sent by O'Mahoney that only older and more senior teachers received Teacher Improvement Plans ("TIP"). No younger teachers or new teachers were on the list which means that no young teacher received an ineffective or developing rating. Herman was on the list as he was incorrectly given a developing rating for the 2013-2014 school year.

28.     On or about September 2, 2014, Herman discovered that his program had changed and that Dr. Clark was now tasked to do ICT. Herman confronted Izzo about the change and she told him she would talk to O'Mahoney. O'Mahoney would not give Herman his position back, despite the fact that a teacher's program cannot be changed when that teacher was awarded a posted position as per the collective bargaining agreement. Herman filed a grievance against O'Mahoney and subsequently won that grievance allowing him to proceed with the ICT position.

29.     On or about September 12, 2014, Herman applied for the position of cafeteria supervisor. Under the union rules, the most senior teachers should be given preference for the position. Additionally, the posted position was meant for one teacher. However, O'Mahoney broke up the

7

position into two positions, giving Herman period five and giving another teacher with less seniority period six. Herman filed a grievance on October 10, 2014 and won. Despite O'Mahoney's efforts, Herman now is the cafeteria supervisor for periods five and six.

30.     On or about September 15, 2014, Herman met with O'Mahoney to discuss his TIP. During this meeting, O'Mahoney told Herman that he is a bad teacher and that his Regents scores were terrible in algebra. Herman reminded O'Mahoney that his scores were in fact great. O'Mahoney looked up Herman's scores and appeared upset when he realized that he was misinformed and misguided with regard to Herman's performance.

31.     On or about October 7, 2014, O'Mahoney and Izzo came into Herman's second period class and began to look through his papers on his podium without permission. Izzo then asked Herman to meet with her and O'Mahoney in the principal's office during seventh period. During this meeting, O'Mahoney yelled at Herman and kept referring to "learning targets," a concept that he discussed in an email he had sent out after he and Izzo had observed Herman. O'Mahoney continued to yell at Herman stating that he had failed to incorporate this method in his lesson. Given that Herman received the email on "learning targets" after he was observed, this was another effort by O'Mahoney to harass, retaliate, and set Herman up to fail.

32.     On or about October 14, 2014, O'Mahoney came to Herman's second period class with Izzo and checked a student's work. Later that day, O'Mahoney asked to meet with Herman. During this meeting, O'Mahoney ridiculed Herman and told him that he is not a good teacher. He also criticized Herman for one of his student's failure to respond to O'Mahoney's questions during the lesson, despite the fact that the student does not speak English.

33.     On or about October 28, 2014, Herman had a formal evaluation conducted by Izzo. During his post observation meeting with Izzo on or about November 6, 2014, Izzo told him that his lesson was good. She then said that O'Mahoney would have to review his rating as he would make the final decision on the rating and make any changes necessary, despite the fact that O'Mahoney did not observe Herman during this lesson. Herman received and signed his observation report on or about November 10, 2014, which indicated that it had last been revised on that same day. Upon information and belief, O'Mahoney changed Herman's ratings, giving him two ineffective ratings and two developing ratings. Upon information and belief, Izzo told two other older teachers, Kathy Morganlander and Keith Black, that O'Mahoney would make the final decision on their evaluation reports, regardless of his presence at the observation.

34.     In or around November 2014, O'Mahoney stated during a staff meeting, "these are the fuck you years for senior teachers. This is the fuck you money." O'Mahoney continued to make these comments in subsequent meetings. On one occasion, Herman asked O'Mahoney what he meant by his comments. O'Mahoney responded and stated, "it's almost impossible to get rid of any senior teacher, the union won't allow that, and to get rid of a senior teacher will take years."

35.     In or around the beginning of March 2015, O'Mahoney informed Herman that he would be teaching an additional geometry class during first period, while he already had a class that period. This required Herman to teach two different types of geometry during the same class period. Moreover, this additional class resulted in Herman having four math classes, teaching four different math subjects, which is against the collective bargaining agreement. Izzo informed Herman that he would start teaching the additional geometry class on March 15, 2015 and that the

additional class would only be for one week. However, Herman is now required to continue teaching this class until the end of the school year.

36. On or about March 24, 2015, Herman had a post observation meeting with Izzo. Izzo had rated Herman effective in every category and the meeting was positive up until O'Mahoney walked in. Izzo stated that Herman's use of assessment in instruction was effective and O'Mahoney gave her a glaring look which prompted Izzo to change her mind and give Herman a developing rating for that category.

37. Despite his constructive and encouraging post observation meeting with Izzo, Herman received a developing overall rating for the 2014-2015 school year.

38. Due to the baseless and false negative ratings that Herman received within the last two school years, he is prevented from applying to additional positions within the board of education, such as after school jobs, tutoring, or college teaching. Additionally, as Sheepshead Bay is closing at the end of the 2015-2016 school year, Herman's ability to find another job will be impeded by his negative overall ratings and will result in him remaining on Absent Teacher Reserve ("ATR").

39. From the foregoing, Herman alleges that Defendants have discriminated against him based on his age and retaliated against him in violation of 42 U.S.C. § 1983, the Age Discrimination in Employment Act, the New York State Human Rights Law, and the New York City Administrative Code.

*Ekaterina Reznikov*

40. Kate is a fifty six (56) year old Russian female, born on September 14th, 1959.

41.     In or around 1997, Kate entered the American school system as a teacher and in or around 1999 was hired by the DOE at Sheepshead Bay as a math teacher.

42.     While at Sheepshead Bay, Kate received glowing reviews from her principals and her teaching methods resulted in high passage rates on the Regents Exams and placement tests.

43.     O'Mahoney was hired as the new principal of Sheepshead in January 2012. Izzo was hired as an assistant principal at Sheepshead in May 2012. Izzo became Kate's direct supervisor in the 2012-2013 school year.

44.     At the start of her tenure at Sheepshead, Izzo demonstrated a pattern and practice of prejudice and animosity towards teachers over forty years old. Izzo was younger and talked with younger teachers about their social lives, sex lives, and generally excluded teachers over the age of forty from their conversations.

45.     In or around October 2012, Izzo told the younger teachers that they would keep their jobs because by the time the school would shut down there would be no older teachers left. In or around November 2012, when teachers over forty years old would attempt to break into the conversation, join in or direct conversation back to professional matters, Izzo would respond, "This conversation is not for oldies!" On another occasion, Izzo told Kate in front of several others, "this conversation is for young people."

46.     In or around November 2012, Kate received an unsatisfactory on her evaluation. This was the first unsatisfactory rating she had ever received in her career. In that same month, co-worker, Steve Cohen, a fellow senior teacher who was afraid of losing his job due to his older status, told Kate, "please stay away from me, I am afraid to be associated with you."

47.     At the beginning of 2013-2014 school year, Izzo became the head of the math department. She took over the only room in the math department with a copy machine. Izzo refused to give the teachers over forty years old keys to the room, while the young teachers were allowed to make a copy of the keys so that they could use the copy machine.

48.     In or around October 2013, Kate took four days off to seek treatment for cancer. Teachers are allotted ten (10) sick days each year. Kate had ninety (90) sick days stored up. O'Mahoney sent Kate a nasty email stating that she better have left a lesson plan for the substitute teacher. When Kate asked Izzo why O'Mahoney would write such an email, Izzo responded "we don't want senior teachers here with your stale methods. I just don't want any senior teachers in this department and this school, period."

49.     On November 4, 2013, Izzo came to observe Kate's class. Izzo told Kate to meet her the next day an hour before her first class (7:40) to discuss the evaluation. On November 5, 2013, Kate arrived at Izzo's office to find the door closed. She heard Izzo in her office with some of the younger teachers. Kate knocked on the door and one of young teachers opened the door and then slammed the door in Kate's face. Izzo refused to admit Kate.

50.     On November 12, 2013, Izzo asked Kate, "I saw you posted works of your students on the wall, did you check their spelling?" Kate responded, "yes, I did my best." Izzo said, "Well what do we expect from you, you don't know how to spell."

51.     On November 13, 2013, Ms. Cooper asked Kate and the rest of the older teachers for $25.00 to pay for a party for Izzo. All the young teachers were invited to attend the party while the teachers over forty years old were not. While the administration is prohibited from receiving presents or money from teachers and vice versa, Kate was pressed to contribute funds for Izzo's party.

52.     On November 14, 2013, Kate received a letter from Izzo asking her to report to her office with her union representative. Izzo informed Kate that she was going to get a disciplinary letter for taking the four sick days she took in October to seek cancer treatment. When Kate asked why, Izzo stated that O'Mahoney instructed her to discipline Kate. Kate began to cry. Izzo stated that she would not put a disciplinary letter into her file. However, when Kate looked at her file in June 2014, the disciplinary letter was there.

53.     Izzo went on maternity leave in December 2013. As a result, O'Mahoney became Kate's direct supervisor. Before leaving, the young teachers expressed concern about having O'Mahoney observing them instead of her. Izzo responded "they have to worry" pointing to the teachers over forty.

54.     During the winter season of the school year, O'Mahoney put four (4) letters into Kate's file expressing gratitude and complementing her on her dedication for coming into school when half of the staff did not because of the inclement weather.

55.     On February 25, 2014, Kate received an evaluation from an observation that occurred in November 2013. Teachers are supposed to receive an evaluation within ninety (90) days after the observation and a post observation conference is supposed to take place soon after the observation. No post observation conference took place following this evaluation. One of the main critiques in the evaluation was that Kate did not utilize her computer or her smart board. However, Izzo put her in a room with no working computers or smart board. Kate had made several requests to have them fixed.

56.     Later that day, a few of the younger teachers, Rebecca Mayfield and Anne Brewka, approached Kate in the bathroom and told her that she does such good job, that her students are

doing well, and that they wanted to learn from her and observe one of Kate's classes. When they asked Izzo, Izzo responded either via phone or email that they could not learn from her and she is not a good teacher. Kate later learned from them that Izzo had told the younger teachers that in order to keep their tenure, they need to be mean to the senior staff.

57.     On February 26, 2014, O'Mahoney and seven (7) other school administrators walked into Kate's class unannounced and started asking the students questions like, "do you understand what she is talking about?", "do you understand her?", "does her accent seem unpleasant to you?" Kate barely finished her lesson as she felt intimidated by the administration's harassment.

58.     On March 3, 2014, O'Mahoney held a meeting before the first class of the school day that went seven (7) minutes into the class time. All the teachers over forty were nervous about arriving to their first class late. The young teachers were relaxed, telling Kate that "it's your responsibility" to arrive to their classes on time. While the first class starts at 8:40 am, O'Mahoney did not let the teachers out until 8:47 am. When Kate left the meeting, O'Mahoney said to her "I don't understand why you're not standing outside of your room when students are arriving," despite the fact that he had kept her late.

59.     On March 4, 2014, Kate had a post observation meeting with O'Mahoney. O'Mahoney leaned over the desk and said "you are the worst teacher in this school. I want you to leave this school and leave this profession. You are a disgrace." Kate responded that all her students are passing her tests and the city tests and that she did not understand his comments. O'Mahoney started yelling at her and said "do not talk when I am talking, you listen to me when I am talking!" Kate felt scared and bullied to the point that she could barely walk. Her colleague, Lebowitz, had to help her walk upstairs to her classroom.

60.     On March 5, 2014, Kate received an "ineffective" observation from O'Mahoney. Every example he gave in his evaluation was contrary to the grading rubric. For example, part of the teaching guidelines at the school is that if a student does not know the answer to a question, the teacher should not tell the student the answer, but should try to help them reach their own answer. Kate exhibited this technique during her observation and O'Mahoney stated in his evaluation that because Kate did not give the student the answer, she does not know math.

61.     Later that day, Kate wrote O'Mahoney a letter stating that all her lesson plans had previously been approved and that she wanted to know what an effective teacher looked like. O'Mahoney refused to provide her anything, but did suggest to her in a letter that she and he would observe Ms. Clark's master lesson. Ms. Clark is a teacher tenured in math the prior year but is a teacher in business studies. O'Mahoney did not join Kate in observing Ms. Clark's class and the class was not effective as students were not paying attention and Ms. Clark only gave the students two simple problems to work on and was not able to solve them herself.

62.     On March 13, 2014, during cohort weekly meeting, Mr. Ford, another assistant principal at Sheepshead Bay, was discussing ELL students (students whose second language is English). Mr. Ford stated, "we can improve the kids, but we can't improve the teachers, although we don't want them, there is nothing we can do about it." Although students had never complained about Kate's language, Kate felt very threatened by this remark.

63.     On March 20, 2014, O'Mahoney held a meeting in the library with all the teachers. O'Mahoney stated, "I have been asked what a highly effective teacher looks like." He then preceded to give details, listing everything that Kate does herself during her lessons.

15

64.     In or around April 2014, Izzo returned from maternity leave. On April 24, 2014, during a faculty meeting, Izzo informed the teachers that the State would be coming to conduct observations. Izzo further explained the observations to the young teachers and told them the exact period when the State would be observing them. Thereafter, Izzo said to the teachers over forty, "you need to be prepared all the time."

65.     The State observations took place from April 29 to May 1, 2014. The days prior, Izzo told Ms. Clark to keep the teachers over forty busy so they could not prepare for their lessons, while the young teachers were permitted to stay in their classrooms and prepare for their observations.

66.     On April 30, 2014, the State observed Kate's classroom. The observation took place while many of her senior students were on a school sanctioned trip. Thus, there were only seven (7) students in her class. Kate was not informed or warned that the State observation would occur that day. A similarly situated teacher, Mr. Vidal, who was a younger teacher, also had his class observed during the school sanctioned trip. He said to Kate, "if Izzo tries to use this against me, I am going to side with the seniors." Izzo approached Mr. Vidal and told him he had nothing to worry about, that the observation would not be used against him. Izzo did not give Kate similar reassurances.

67.     Izzo also observed Kate during the State observations. The school administration had informed the teachers that they would not be observed during the State observations. Kate asked Izzo why she observed her and Izzo said, "I did that because I want all the senior teachers out of here."

68.     On May 1, 2014, Kate had a biopsy procedure scheduled and she had to leave work forty (40) minutes early. Kate told Izzo that she would not be able to come to a scheduled meeting. Izzo

responded, "these meetings are important, please schedule to be sick in the summer. You remind me of my mother, she had cancer, but she never died." Later that day, Izzo said to Kate, "it is your responsibility to find out what happened at the meeting, I am not going to repeat myself." Kate arrived to her classroom with a red face, as she had been crying, after Izzo's harassment. O'Mahoney walked by her classroom while she was in the middle of her lesson and said, "I see Reznikov has a red face, this is a good time to observe her."

69.     On May 2, 2014, Kate arrived early to school to meet with a few of her students for tutoring purposes. Izzo walked by her classroom and said to Kate, "here you are with the kids again, if you were a good teacher you would not have to tutor." Kate responded, "you are killing me physically, I do not deserve this treatment." Izzo then said, "you remind me of my mother. I hate her and I hate you." Later in the day, Kate made a formal request to meet with Izzo concerning her treatment towards her. Izzo agreed, but then never showed up to the scheduled meeting.

70.     On May 8, 2014, Izzo told Kate that she was going to give her a post observation conference discussing how terrible of a teacher she is. Ironically, Kate's students had all just passed their placement exams. When Kate went to Izzo's office for the post observation conference, Izzo said "what are you doing? You are not supposed to be here!" At a department meeting later in the day, in front of the faculty, Izzo yelled at Kate "why won't you get it through your head! There will be no post! I will write a letter and put it in your mailbox and that's it! Got it?" From then on, Izzo refused to give Kate a post and she was the only teacher not granted the required post following her observations.

71.     On May 22, 2014, Izzo and a few of the younger teachers walked by Kate. Izzo said, "by the way, I don't like the way you carry yourself so unprofessionally," without basis in fact.

17

72.     On May 23, 2014, during a faculty meeting, Izzo accused Kate of allowing her students to walk in the hallway without a pass. Kate denied the accusation and asked to speak to her outside the meeting. While outside, Izzo said to Kate, "I will still rate you as an ineffective teacher, you need to leave the system." Kate responded, "I need my medical benefits for my cancer." Izzo said, "oh, die already!"

73.     On May 29, 2014, there was a faculty meeting near O'Mahoney's office. Kate saw the Regents exam preparation books. She asked Izzo when the teachers would be getting the books. Izzo responded, "you are not going to get them. When all the senior teachers are gone next year, Ms. Castillo will get the books." Kate never received the books nor did her students. For the next school year, these books will be obsolete.

74.     On June 9, 2014, Izzo told Kate to come to her office at 9:50 am. When Kate arrived, Izzo refused to open the door as she was socializing with some of the younger teachers. By the time Izzo opened the door, Kate had a class to teach. Izzo said to Kate that they did not have time to talk, as if it was Kate's fault. Izzo stated that she was going to rate Kate on what she saw instead of talking. Thereafter, Izzo rated Kate ineffective, without any proper basis.

75.     On June 17, 2014, during one of the Regents exam proctoring days, Kate arrived an hour early before her shift to talk to Maura Wynn, the exam coordinator, about leaving early on June 20 for a medical procedure to treat her cancer. Kate suggested she would arrive an hour earlier. Wynn refused without any explanation. Then Wynn herself was out of school for two and a half days.

76.     Kate worked that day from 10:00 to 12:40 in the library and then from 12:40 to 4:15 administering a test. She was not permitted to use the bathroom. After she submitted the test

materials in the library, she went to use the bathroom. Mr. Ford watched Kate walk towards the bathroom. When she returned to the library, Mr. Ford said, "Reznikov, where have you been all day? I was looking for you the whole day. Where were you right now?" Kate responded, "you saw me walking into the bathroom." Mr. Ford said that her behavior is "punishable" and that she was going to hear about it. Black, a colleague of hers, was there during this conversation.

77.     Later that day, Angel, a young science teacher who was in charge of collecting the Regents exam materials, told Black and Kate to relieve Mr. Vidal and Mr. Pressour, both young teachers, of their duties in order for them to take a break. The latter teachers had started working the same time as Black and Kate. Izzo walked by Kate and Kate said, "someone will come to relieve me, right?" Izzo responded, "I don't think so, you're going to stay here until 6." Kate said, "what if I need lunch or a bathroom break?" Izzo responded, "I don't believe you need any of those things."

78.     On June 18, 2014, when Kate brought her Regents exam materials back to the library, the young teacher in charge of collecting the materials kept looking for faults. He asked Kate about signatures, purposefully questioning her abilities and intelligence. Kate said, "what are you trying to do?" He answered, "I am doing what I was told." Izzo walked over and said to Kate "you're going to get a letter, why are you giving him a hard time? Why are you talking to me disrespectfully?" Kate responded, "I'm not, I brought back the papers, what is the problem?" Then Izzo said, "you have to take lunch for forty two minutes, I'll be watching you. There are always problems with you, all you senior teachers." Kate felt so bullied that she could not walk home, as she usually did. She had to call her husband to pick her up. She also suffered from lower abdominal pain because she was not given bathroom breaks. She went to the doctor that night and the doctor told her that she must take bathroom breaks in order to alleviate the pain.

79.     On June 20, 2014, Kate arrived to the library at 8 am. Izzo told her "glue your behind to the chair to answer the phones." Kate responded, "Until when? I need to go to the hospital for a procedure." Izzo said, "I'll allow you to leave at 1:40 pm, but you have to be at the phone at all times." During the day, Kate had to use the bathroom. She asked another teacher to relieve her so she could take a bathroom break. The teacher refused. He said, "Izzo is outside. I don't want to get in trouble."

80.     Kate suffered a lot of abdominal pain and was shaking to the point that the doctors could not perform her procedure later that day.

81.     On June 23, 2014 through June 24, 2014, Kate and a few of the math teachers were sent out to grade Regents exams at New Utrecht High School. Kate did a remarkable job and the administration at New Utrecht wrote her a nice letter complimenting her.

82.     On June 26, 2014, Kate's last day at Sheepshead Bay, she received a letter inviting her and her union representative to Izzo's office. When Kate arrived, Izzo told her that she was getting a disciplinary letter because she had taken an hour for lunch instead of forty-two minutes. Kate stated that Izzo's accusation was untrue. Izzo said, "fact or no fact, you are going to be ineffective, you are going to lose your license. Kate responded, "you just don't want me to be alive." Izzo responded, "exactly."

83.     Later that day, Kate asked one of the secretaries to make a copy of her file. When she got the copies, she realized that all the commendation letters were taken out of her file.

84.     Kate received an ineffective overall rating for the 2013/2014 school and was placed on ATR. Kate was placed at Franklin Delano Roosevelt High School for the 2014/2015 school year and received an overall rating of highly effective.

85.     In or around June 2015, Kate was placed back on ATR.

86.     Based on the foregoing, Kate alleges that Defendants discriminated against her based on age, disability, and national origin in violation of 42 U.S.C. § 1983 and the New York State and City Human Rights Laws, and has suffered emotional, physical, and financial damages.


_Keith Black_

87.     Black is a forty-seven (47) year old male, born on August 5, 1968.

88.     Black began his employment with Defendant, the DOE, in September 1998 as a Mathematics Teacher at Newtown High School.   Black has been employed as a Mathematics Teacher at Sheepshead Bay since September 1999.

89.     In or about 2003/2004, Black received treatment for anxiety symptoms and was prescribed medication for his condition. He informed Defendants of his anxiety diagnosis on or about March 20, 2013.

90.     In or around December 2010, O'Mahoney became the Principal of Sheepshead Bay, and as such, became Black's supervisor. Up to this point, Black had an exemplary record of performance within the DOE, receiving all satisfactory observations and yearly reviews, and was never the subject of any discipline.

91.     In or around early 2012, Black requested Family Medical Leave Act (FMLA) leave to care for a sick family member, his mother. Defendants approved Black's request for the period February 13, 2012 through June 30, 2012.

92.     In or around late November 2012, Black scheduled an observation with his Academy Leader, Maura Wynn ("Wynn") for December 5, 2012. Thereafter, on or about November 30,

2012, Wynn and O'Mahoney made an unannounced visit (referred to as an informal observation) to one of Black's classrooms.

93.     After the November 30, 2012 informal observation, Black met with O'Mahoney and Wynn for a post observation conference. O'Mahoney gave Black suggestions and O'Mahoney advised Wynn to write up the observation as an informal observation, which meant that the observation would not count in Black's yearly teacher rating.

94.     On December 5, 2012, Wynn observed Black in one of his classrooms for a formal observation and gave Black a satisfactory rating. Later, Black also received the report from the November 30, 2012 informal observation from Wynn.

95.     Thereafter, on or about January 3, 2013, O'Mahoney gave Black an unsatisfactory rating from an alleged formal observation O'Mahoney claimed took place on December 3, 2012 during Black's fourth period class. Upon information and belief, this observation is the same informal observation that took place on November 30, 2012. However, in the 2012/2013 school year, Black did not have a fourth period class and no such evaluation took place on December 3, 2012. O'Mahoney falsified observation reports in order to give Black an unsatisfactory rating. Younger co-workers, and/or those who do not suffer from severe anxiety, did not have false observation reports created about them.

96.     In or around March 4, 2013, Black called in sick to the DOE's absence registry voicemail, wherein Black indicated that he was battling an illness and that he hoped to be back the following week. On or about March 10, 2013, Black advised Defendants that he was still ill and would need another week for recuperation. On or about March 17, 2013, Black again advised Defendants that he was still ill and he would need the week to recuperate. Black utilized his accrued sick days

while he was out in March 2013 as per his doctor's orders to treat and recover from his anxiety and post-traumatic stress disorder ("PTSD") condition.

97.     In or around mid-March 2013, Black received a voicemail from Wynn about his anxiety disability.   Black left Wynn a voicemail stating that he was under a great deal of strain and stress. Wynn never asked Black to provide any medical documentation regarding his disability.

98.     Shortly thereafter, on or about March 20, 2013, Black received correspondence from O'Mahoney that stated Black must either provide O'Mahoney with medical documentation, return to work immediately, or resign as a teacher with the DOE.

99.     In response to O'Mahoney's letter, and on or about March 20, 2013, Black's treating psychiatrist, Dr. Valeriy Chernov, MD ("Chernov") provided Defendants with documentation that, due to his anxiety, Black's medical and emotional condition would not allow him to perform his work related activities at that time.

100.     In addition to requesting medical documentation for his absences, O'Mahoney's letter, dated March 20, 2013, also demanded Black fill out an OP 160 form requesting a Restoration of Health, which Black completed and emailed to O'Mahoney's office.

101.     On or about April 3, 2013, Dr. Chernov sent another letter to Defendants, advising that Black was still suffering from emotional difficulties, and would not be able to return to work until April 29, 2013. His emotional difficulties included anxiety, depression, and PTSD.

102.     On April 29, 2013, Black resumed teaching at Sheepshead Bay.   Upon returning to work, Black sent Defendants correspondence that he was withdrawing his request for Restoration of Health leave because he had returned to work.

103.     After Black returned to work, O'Mahoney consistently harassed Black and disciplined or

23

attempted to discipline Black for falsified and/or baseless reasons due to his age and/or disability. This was evident both by the falsity of the allegations, as well as the fact that Black's similarly situated, younger and/or non-disabled coworkers were not similarly treated.

104.    For example, O'Mahoney assigned Black an academy meeting that had no relation to the classes or the students Black actually taught. The new academic meeting resulted in Black having four periods in a row, which is excessive for someone who just returned from a two month sickness. Black spoke to O'Mahoney about attending his regular academic meeting. O'Mahoney yelled back, "No! Stay in the academy I assigned to you. You are a grown man, you shouldn't be here if you can't do your job!"

105.    Similarly, O'Mahoney also unjustifiably criticized Black's job performance, despite the fact that Black's colleagues and students' parents observed him to be an exceptional teacher.

106.    On or about May 13, 2013, O'Mahoney entered Black's classroom with an assistant principal to observe Black's class. During the post observation conference, O'Mahoney told Black that he liked Black's lesson. Although O'Mahoney performed a formal observation of Black's classroom, Black never received the observation report from O'Mahoney.

107.    On or about May 16, 2013, Black attended a meeting with assistant principal Mario Ford ("Ford").   Ford discussed Black's absences with him.   Black explained that all his absences were approved by the DOE. Ford accused Black of a pattern of taking off every spring, claiming that Black's Family Medical Leave for his mother's illness and short leave for his anxiety condition hurt Regents students. Ford warned Black that he could give him a disciplinary letter for these absences, stating, "Right or wrong, you're not here." Black pointed out that his mother almost died and that he had an anxiety condition that was well documented by his doctor. Other similarly

situated employees who were younger and/or non-disabled were not harassed about utilizing sick days and/or pre-approved leaves of absence for legitimate medical reasons.

108.    In or around May 2013, upon information and belief, O'Mahoney told another employee, Ms. Komarovsky, at Sheepshead Bay, that Black knows how to beat the system and he would get Black the following year.

109.    The following school year, in or around October 2013, the assistant principal of Special Education, Izzo, who upon information and belief is a member of O'Mahoney's family, conducted an informal observation of Black's class, giving him a borderline developing rating.   In or around December 2013, Izzo conducted another informal observation of Black's class, again giving him one developing and one ineffective.

110.    In or around December 2013 Izzo went out on maternity leave. Prior to leaving for maternity leave, Izzo completed formal observations of Black's younger and/or non-disabled colleagues but did not complete a formal observation of older teachers including Black. Black heard Izzo state, "I take care of my own."

111.    In or around March 2014, the temporary Math Coach, Dr. Lisa Clark ("Clark"), conducted a coaching session of Black's classroom.   Dr. Clark suggested to Black that he stop relying on the blackboard as much and to try incorporating the use of the projector and chart paper in his lessons. Black advised Dr. Clark that he did not have any chart paper.   Dr. Clark told Black that she would order more chart paper as she was in charge of ordering supplies for the Math Department.

112.    In or around March 19, 2014, O'Mahoney conducted an informal observation during Black's first period class. O'Mahoney gave Black ten ineffective ratings and made sure to put a time code on each and every incident, even writing seven entries in one minute. Additionally,

O'Mahoney gave Black a negative evaluation with respect to the physical appearance of his classroom that Black shares with a younger teacher, Mr. Vidal.   Thereafter, despite the fact that there was no change in the physical appearance of the classroom, O'Mahoney gave Mr. Vidal a positive rating for the same classroom's appearance.

113.    On or about March 21, 2014, Black attended a post observation conference with O'Mahoney for the March 19, 2014 observation.   O'Mahoney berated Black for not having chart paper, even though Black had already requested chart paper.   O'Mahoney alleged that Black's students did not respect Black, that students arrived to the class late, and that one student, "M", had an outburst during Black's lesson, all of which were false. O'Mahoney also advised Black that he should be using a computer, even though Black's classroom was not set up to use a computer. During the post observation conference, O'Mahoney would not allow Black to defend himself against his false and baseless allegations. Black repeatedly asked to respond, but O'Mahoney would not allow him to do so. He felt intimidated and bullied, as O'Mahoney subjected him to psychological degradation. O'Mahoney allowed Black's younger and/or non-disabled colleagues to defend themselves and rebut allegations that were made during post observation conferences and did not make false and/or baseless allegations against them.

114.    On or about March 25, 2014, at a Math Department meeting, O'Mahoney handed Black his observation report in front of all the other teachers. Black refused the report as O'Mahoney should have given him the report during his post observation conference. O'Mahoney raised his voice to Black and demanded Black come to O'Mahoney's office and pick up the report. Similarly situated younger teachers and/or those who do not suffer from severe anxiety were not humiliated or given observation reports in a public setting.

115.     Later that same day, O'Mahoney sent Black an email stating, "Please be reminded to sign the observation report and return it to Ms. Dellis by Thursday, March 27 at 3 pm. You will receive a copy and a copy will be placed in your file." Black felt bullied and felt that O'Mahoney was insulting him. Similarly situated teachers did not receive email reminders to sign their observation report.

116.     O'Mahoney's harassment aggravated Black's anxiety, and on April 1, 2014, Dr. Chernov sent a letter to Defendants advising that due to Black's anxiety disability, Black would need a leave from work from April 1, 2014 through April 2, 2014.

117.     On April 28, 2014, Dr. Chernov sent another letter to Defendants advising that Black's anxiety and depression had worsened and that he would require at least three (3) days of rest. Thereafter on May 1, 2014, Black's treating psychologist, Dr. Jane E. Gartner, PhD ("Gartner") sent correspondence to Defendants regarding Black's treatment by Dr. Gartner for Black's anxiety and depression due to increased stress and tension at work.

118.     On May 13, 2014, Izzo conducted a formal observation of Black's classroom. Izzo arrived ten minutes late and gave Black four ineffective ratings and twelve developing scores despite the fact that her allegations were factually incorrect and had no basis for her ratings.

119.     Upon O'Mahoney becoming Principal at Sheepshead Bay, it was common knowledge amongst the staff that O'Mahoney held older teachers in disdain and preferred younger teachers on his staff.   Numerous staff members, including Black, would be subjected to looks of disdain and disgust from O'Mahoney, who did not similarly show this contempt for younger teachers and staff.

120.     Since O'Mahoney became Principal, O'Mahoney and Izzo have advised younger teachers

prior to them conducting an informal observation of them.   For example, in or around late March

2014, young special education teacher, Ms. Velarde, who shares a classroom with Black, asked

him if he could try and leave a little early the following day because she was going to get an

informal observation from O'Mahoney. He had told her in advance that he was coming to observe

her. Informal Observations are supposed to be unannounced visits.   Older teachers, including

Black, were not advised by O'Mahoney or Izzo of when they were conducting informal

observations of the older teacher's classrooms.

121.    Additionally, O'Mahoney has given preferential treatment to younger teachers.   Older

teachers, including Black, were repeatedly observed during their first period classes, when children

were often still arriving late, whereas, other teachers were allowed to reschedule observations

because of low attendance.   Younger teachers have been allowed to reschedule an informal

observation when they do not have a lesson plan prepared on the day of the informal observation.

Older teachers received unsatisfactory ratings if they did not have a prepared lesson plan during

an informal observation.

122.    Moreover, throughout O'Mahoney's tenure as principal at Sheepshead Bay, O'Mahoney

has subjected older teachers to unfounded discipline, like Susan Crichlow, Barry Martin, Herman

Lebowitz, and Kathleen Morgenlander, and generally harassed older teachers into retirement, like

Steve Cohen, while consistently replacing them with younger teachers.

123.    Black has made several requests to be transferred out of Sheepshead Bay due to the hostile

work environment he is subjected to on a daily basis. However, that request has not been granted.

124.    In or around June 2014, Black was on "excess" status, waiting to be assigned to a new

school. On or about August 26, 2014, Black was told that he would be remaining at Sheepshead

Bay. When Black arrived back to school, O'Mahoney did not have a program established for him. Thus, Black taught no classes for three and a half weeks and the beginning of the 2014-2015 school year. Finally, in the fourth week of the new school year, O'Mahoney assigned Black to teach Trigonometry, a class he has not taught for seventeen (17) years and gave him no time to learn the subject or prepare for the class.

125.    Despite the advice of his mental health doctors, Black endured the hostile work environment for a semester. Black was forced to take nine (9) days off during the semester due to panic attacks, anxiety, and PTSD.

126.    On or about February 23, 2015, Black went on extended leave due to his PTSD.

127.    On or about June 13, 2015, the DOE informed Black that he was going to be placed in excess from Sheepshead Bay for the 2015-2016 school year.

128.    As a result of the above discrimination and failure to accommodate his disability, Black has suffered emotional damages.

129.    From the foregoing, Black alleges that Defendants have discriminated against him based on his age, disability, and retaliated against him in violation of 42 U.S.C. § 1983, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Administrative Code.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

130.    Plaintiffs repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

131.    Defendant, DOE, while acting under color of federal law, deprived Plaintiffs of their constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution,

in violation of 42 U.S.C. § 1983.   The Defendant has intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiffs' constitutional rights in that the Defendant's custom or practice of discriminating and/or retaliating against Plaintiffs due to Kate's age, disability, and/or national origin and Black's age and/or disability to perpetuate, without abatement, in violation of Plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

132.   The individual Defendants, O'Mahoney and Izzo, unlawfully participated in and/or permitted the aforementioned discriminatory actions, hostile work environment, and/or retaliation, because of Lebowitz's age, Kate's age, disability, and/or national origin, and Black's age and/or disability, to perpetuate, without abatement, in violation of Plaintiffs' constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

133.   Plaintiffs Lebowitz, Kate, and Black, repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint. The Age Discrimination in Employment Act of 1967 provides that:

> a.   It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter.

134.   As described above, Defendant, DOE, has taken adverse employment actions against Plaintiffs' Lebowitz, Kate, and Black including subjecting them to a hostile work environment,

maintaining an atmosphere of adverse actions, making comments regarding their age, and mischaracterizing their performance, actions taken because of Plaintiffs Lebowitz, Kate, and Black's age, in violation of the Age Discrimination in Employment Act of 1967.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

135.   Plaintiffs Lebowitz, Kate, and Black repeat, reiterate, and reallege each and every allegation in the above paragraphs of this complaint. The Age Discrimination in Employment Act provides that

a.  It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

136.   As described above, the DOE continues to retaliate against the Plaintiffs for opposing discriminatory practices in violation of the Age Discrimination in Employment Act of 1967.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

137.   Plaintiff, Black, repeats, reiterates, and realleges each and every allegation in the above paragraphs of this complaint. The Americans with Disabilities Act provides that:

a.  No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

31

    b.  As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes—

        i.  (5) (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

138.    As described above, the Defendant discriminated against Plaintiff Black by failing to accommodate his requests to be transferred or moved after notifying them that he was suffering from a disability in violation of the Americans with Disabilities Act.

**AS A FIFTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER FEDERAL LAW**

139.    Plaintiff Kate, repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint. Title VII of the Civil Rights Act of 1964 provides that

    a.  It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

140.    As described above, the DOE has taken adverse employment actions against Plaintiff, including maintaining an atmosphere of adverse actions, and subjecting her to a hostile work environment, which were motivated, in part, upon Plaintiff's national origin in violation of Title VII of the Civil Rights Act of 1964.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

140.   Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

141.   The Administrative Code of City of NY § 8-107 [1] provides that

    a.   It shall be an unlawful discriminatory practice: (1) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

142.   As described above, Defendant has taken adverse employment actions against Plaintiffs, including subjecting them to a hostile work environment, maintaining an atmosphere of adverse actions, making comments regarding Lebowitz's age, Kate's age, disability, and national origin, and Black's age and disability, and mischaracterizing their performance, which were because of Lebowitz's age, Kate's age, disability, and national origin and Black's age and disability in violation of New York City Administrative Code Title 8.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

143.   Plaintiffs Lebowitz, Kate, and Black repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

144.   New York City Administrative Code Title 8-107(13) provides for employer liability for discriminatory conduct by employee, agent or independent contractor:

    a.   An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

33

     b.   An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

     c.   the employee or agent exercised managerial or supervisory responsibility; or

(2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

(3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

145.    As described above, the Defendant's actions are in violation of the New York City Administrative Code Title 8-107(13).

## AS A EIGHTH CAUSE OF ACTION FOR DISCRIMINATION
## <u>UNDER THE NEW YORK CITY ADMINISTRATIVE CODE</u>

146.    Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

147.    The New York City Administrative Code Title 8, §8-107(1)(e) provides that it shall be an unlawful discriminatory practice: "For an employer to discriminate against any person because such person has opposed any practices forbidden under this chapter . . ."

148.    As detailed above, the Defendant has violated New York City Administrative Code Title 8.

## AS AN NINETH CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR DISCRIMINATION
## <u>UNDER THE NEW YORK CITY ADMINISTRATIVE CODE</u>

149.    Plaintiffs Lebowitz, Kate, and Black repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

150.    Under New York City Administrative Code Title 8-107(6), "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

151.    As detailed above, O'Mahoney and Izzo aided and abetted the acts of discrimination and harassment alleged above by participating in the discrimination and hostile work environment Plaintiffs were subjected to, in violation of the New York City Administrative Code Title 8-107.

## AS A TENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

152.    Plaintiffs Lebowitz, Kate, and Black repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint. New York State Human Rights Law provides that

   a.   It shall be an unlawful discriminatory practice: (1) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

153.    As described above, the Defendant's actions are in violation of the New York State Human Rights Law.

## AS A ELEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

154.    Plaintiffs' Lebowitz, Kate, and Black repeat, reiterate, and reallege each and every allegation made in the above paragraphs of this complaint.

155.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

156.    As detailed above, Defendant is continuing to retaliate against Plaintiffs in violation of the New York State Executive Law § 296.

**AS AN TWELFTH CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR DISCRIMINATION UNDER STATE LAW**

157.    Plaintiffs Lebowitz, Kate, and Black repeat, reiterate and reallege each and every allegation made in the above paragraphs of this complaint. New York State Executive Law §296(6) provides that it "shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

158.    As detailed above, O'Mahoney and Izzo aided and abetted the acts of discrimination and harassment alleged above by participating in the discrimination and hostile work environment Plaintiffs were subjected to, in violation of the New York State Executive Law § 296.

WHEREFORE, Plaintiffs demand judgment against Defendants for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other damages permitted by law.   It is further requested that this Court grant reasonable attorneys' fees

and the costs and disbursements of this action and any other relief to which Plaintiffs are entitled.

Plaintiffs demand a trial by jury.


Dated:  Long Island City, New York
        November 24, 2015

                                         WHITE, RICOTTA & MARKS, P.C.
*Attorneys for Plaintiffs*
3110 37th Avenue, Suite 401
Long Island City, New York 11101
(347) 464-8694


_____/s_____
JAMIE HAAR

37