UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

HERMAN LEBOWITZ, EKATERINA REZNIKOV, and
KEITH BLACK,

                              Plaintiffs,

                    -against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, JOHN O'MAHONEY, and LAURA IZZO
(individually and in their official capacities),

                            Defendants.

----------------------------------------------------------------------- x

**MEMORANDUM OF
DECISION AND ORDER**

15-cv-2890, 15-cv-5548
(LDH) (ST)

LASHANN DEARCY HALL, United States District Judge:

      Plaintiffs Herman Lebowitz, Ekaterina Reznikov, and Keith Black (together, "Plaintiffs")

bring the instant consolidated actions against the New York City Department of Education

("DOE"), John O'Mahoney, and Laura Izzo (the "Individual Defendants") (together,

"Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, ("Title VII"), the

Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act

("ADEA"), the Family and Medical Leave Act ("FMLA"), the New York State Human Rights

Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and New York

common law. Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss

the Third Amended Complaint ("Complaint") in its entirety.

**BACKGROUND[1]**

      Plaintiffs are former mathematics teachers at Sheepshead Bay High School ("SBHS") in

Brooklyn, New York. (Compl. ¶¶ 13, 52, 99.) SBHS closed at the end of the 2015-2016 school

---

[1] The Court assumes the facts alleged in the Complaint to be true for purposes of evaluating the instant motion.

year.  (*Id.* ¶ 49.)  During the relevant time period, O'Mahoney was the principal of SBHS, and Izzo was the assistant principal for special education.  (*Id.* ¶¶ 10-11.)

Shortly after O'Mahoney became principal of SBHS in January 2012, he informed the school staff that the school was over budget by millions of dollars.  (*Id.* ¶¶ 14, 16.)  O'Mahoney often asked the older teachers, who typically earned higher salaries than younger, less senior teachers, when they were going to retire.  (*Id.* ¶ 16.)  In addition, he threatened to discharge them if they did not retire.  (*Id.*)  In or about May 2012, O'Mahoney made all of the teachers at SBHS reapply for their jobs.  (*Id.* ¶ 17.)  He then hired back the vast majority of younger teachers.  (*Id.*)  Most, if not all, of the teachers that were not rehired, including Lebowitz, were over forty years old.  (*Id.*)

In response, Plaintiffs' union filed a grievance on the basis that O'Mahoney violated the collective bargaining agreement's seniority provisions by not rehiring the older teachers.  (*Id.* ¶ 18.)  In June 2012, an arbitrator ruled in the union's favor, and Lebowitz and the other discharged teachers were reinstated to their positions.  (*See id.* ¶¶ 18, 105.)  O'Mahoney then decided not to discharge any teachers, because under the collective bargaining agreement's seniority provisions, O'Mahoney would have been required to discharge the younger teachers first.  (*Id.*)  O'Mahoney made it known that he wanted all of the math teachers—all of whom were over forty years old—to receive a rating of "unsatisfactory" regardless of their performance.  (*Id.* at ¶ 20.)  Plaintiffs also allege that O'Mahoney subjected older teachers to "unfounded discipline, baseless ratings, and harassment, and strong-arm[ed] them into retirement, while consistently replacing them with younger teachers."  (*Id.* ¶ 28.)  In addition, O'Mahoney allegedly tampered with the process for administering diagnostic academic tests so

that the older teachers could not rely on student test scores to show how they improved their students' performances during the year.  (*Id.* ¶ 107.)

Plaintiffs allege that Izzo also demonstrated a pattern and practice of discrimination towards teachers over forty years old.  (*Id.* ¶ 55.)  Izzo socialized with the younger teachers, and she excluded teachers over forty years old by saying things like "this conversation is not for oldies."  (*Id.* ¶¶ 55-56.)  Izzo told several younger teachers that, in order to keep their tenure, they needed to "be mean to the senior staff." (*Id.* ¶ 66.)  In or around October 2012, Izzo told the younger teachers that they would keep their jobs because, by the time SBHS shut down, no older teachers would be left.  (*Id.* ¶ 56.)  During a staff meeting in December 2013, Izzo stated that she would "take care of" the younger teachers.  (*Id.* ¶ 23.)  Izzo made sure that all the younger teachers had keys to her room, which had a Xerox machine and other supplies, but denied the senior teachers access to these resources.  (*Id.*)  Izzo gave the younger teachers more time and advance notice to prepare for observations than senior teachers.  (*Id.* ¶¶ 27, 76.)  The younger teachers also received "do-overs" of their observations, such that less successful observations did not impact their performance evaluations.   (*Id.* ¶ 26.)  These opportunities were not afforded to the older and more senior teachers.  (*Id.* ¶ 26.)

I.      **Allegations Specific to Plaintiff Lebowitz**

Plaintiff Lebowitz is fifty-nine years old and began his employment with Defendant DOE in September 1990.  (*Id.* ¶ 12-13.)  He began working at SBHS in September 2000.  (*Id.* ¶ 13.)  Historically, Lebowitz had received satisfactory annual reviews.  (*Id.* ¶ 14.)  After O'Mahoney became principal of SBHS, Lebowitz received negative feedback and poor performance evaluations following classroom observations.  (*See id.* ¶¶ 22, 26, 29, 30, 37-39, 44, 48.)  On several occasions, O'Mahoney allegedly influenced Izzo to change a positive evaluation of

Lebowitz to a negative one without any basis for doing so or simply changed the ratings himself. (*See id.* ¶¶ 39, 42.)  Plaintiffs allege that similarly situated teachers under the age of forty or who did not complain about discrimination did not receive baseless poor evaluations.  (*Id.* ¶ 22.)

In December 2013, Izzo held a staff meeting during which one younger teacher pointed at the older teachers in the room and said, "You guys are going to get it."  (*Id.* ¶ 23.)  At that time, two other teachers repeated an ongoing joke about Lebowitz in which one teacher said, "I have great news," and the other teacher, posing as Lebowitz, stated, "I still have a job."  (*Id.*)  On several occasions, O'Mahoney told Lebowitz that the last years of a teacher's career were the "f**k you years" and "f**k you money."  (*Id.* ¶¶ 21, 40.)  During one such interaction, O'Mahoney told Lebowitz that the union made it "almost impossible" to get rid of senior teachers, and that doing so would "take years."  (*Id.* ¶ 40.)

On May 21, 2014, Lebowitz applied and was hired for an integrated co-teaching ("ICT") position for the upcoming school year.  (*Id.* ¶ 31.)  On September 2, 2014, Lebowitz discovered that the position had been reassigned to Dr. Lisa Clark, which violated the collective bargaining agreement's seniority provisions.  (*Id.* ¶ 32.)  When O'Mahoney and Izzo refused to give the position back to Lebowitz, Lebowitz filed and won a grievance against O'Mahoney and was allowed to proceed with the ICT position.  (*Id.*)

At the beginning of the 2014-2015 school year, O'Mahoney sent out an email to the entire staff listing the teachers who were rated as "developing" or "ineffective" and therefore warranted a Teacher Improvement Plan ("TIP").  (*Id.* ¶¶ 33-34.)  This information was supposed to be held confidential.  (*Id.* ¶ 34.)  Only older and more senior teachers, including Lebowitz, were listed.  (*Id.* ¶ 33.)  Lebowitz was humiliated by the sharing of this information and experienced ridicule from younger teachers.  (*Id.* ¶ 34.)

On September 12, 2014, Lebowitz applied for the position of cafeteria supervisor. (*Id.* ¶ 35.) Per union rules, the position was meant for only one teacher, and preference was to be given in order of seniority. (*Id.*) O'Mahoney divided the position in two between Lebowitz and another, less senior teacher. (*Id.*) Lebowitz filed and won a grievance and became the sole cafeteria supervisor. (*Id.*) In March 2015, O'Mahoney assigned Lebowitz to teach an additional geometry class. (*Id.* ¶ 41.) This additional class resulted in Lebowitz teaching four classes, each in a different area of mathematics, in violation of the collective bargaining agreement. (*Id.*)

Plaintiffs allege that, because of the "baseless negative ratings" Lebowitz received, he was prevented from applying to additional positions within the DOE, including after-school jobs, tutoring, or college teaching. (*Id.* ¶ 49.) Plaintiffs also contend that, given the closing of SBHS, Lebowitz's negative ratings will impede his ability to find another job and will result in him remaining on absent teacher reserve ("ATR").[2] (*Id.*)

## II.     Allegations as to Plaintiff Reznikov

Plaintiff Ekaterina Reznikov is fifty-seven years old and is of Russian descent. (*Id.* ¶¶ 51-52.) She began teaching mathematics at SBHS in 1999. (*Id.* ¶ 52.) In her years at SBHS, Reznikov historically received "glowing reviews" from her principals. (*Id.* ¶ 53.)

In October 2013, Reznikov took four days off to seek treatment for a condition that was suspected to be cancer. (*Id.* ¶ 60.) On November 14, 2013, Izzo informed Reznikov that, at

---

[2] In opposition to Defendants' motion, Plaintiffs argue that the DOE has brought charges against Lebowitz under New York Education Law § 3020-a, with the intent to discharge him. (Pls.' Opp'n 5, 7, ECF No. 37.) Plaintiffs also provide affidavits by Lebowitz and his counsel stating the same and attach as an exhibit the specifications and bill of particulars brought against Lebowitz. (*See* Lebowitz Aff., ECF 37-1; Lebowitz Aff., Ex. A, ECF No. 37-2; Ehrlich Decl., ECF No. 37-3.) However, Plaintiffs have not sought leave to file a fourth amended complaint, and these new allegations are not properly before the Court. *See Smith v. City of New York*, 290 F. Supp. 2d 317, 319 n.2 (E.D.N.Y. 2003) (citing *Bennett v. Cardinal Health Marmac Distribs.*, No. 02-cv-3095, 2003 WL 21738604, at *2 (E.D.N.Y. July 14, 2003)) (declining to consider plaintiff's affidavit containing new allegations because the court would not convert motion to dismiss into one for summary judgment, and in evaluating a 12(b)(6) motion, the court could not consider such an extraneous document).

O'Mahoney's directive, Reznikov would receive a disciplinary letter for those absences. (*Id.* ¶ 63.) When Reznikov began to cry, Izzo stated that she would not issue the disciplinary letter, but Reznikov later found that letter in her file. (*Id.*) On May 14, 2014, Reznikov needed to leave work early for a biopsy, which conflicted with a scheduled meeting with Izzo. (*Id.* ¶ 79.) Izzo informed Reznikov, "These meetings are important, please schedule to be sick in the summer. You remind me of my mother, she had cancer, but she never died." (*Id.*) Izzo instructed Reznikov to find out for herself what happened at the meeting because Izzo would not repeat herself. (*Id.*) Reznikov felt harassed and cried. (*Id.*) On May 23, 2014, Izzo told Reznikov that she would rate Reznikov as ineffective because she "need[ed] to leave the system." (*Id.* ¶ 83.) When Reznikov responded that she needed her medical benefits for her cancer, Izzo responded, "Oh, die already!" (*Id.*)

Plaintiffs contend that Defendants continued to interfere with Reznikov's medical needs by not allowing her to use the bathroom. (*Id.* ¶¶ 87-90.) On June 17, 2014, during the Regents exams, Reznikov was assigned to proctor an exam and sit in the library for most of the day. (*Id.* ¶¶ 86-87.) When Reznikov asked Izzo if she would be able to break for lunch or to use the bathroom, Izzo replied, "I don't believe you need any of those things." (*Id*. ¶ 88.) After being further admonished by Izzo, Reznikov felt so bullied that she could not walk home, and she suffered from abdominal pain because she was not given bathroom breaks. (*Id.* ¶ 89.) On June 20, 2014, Reznikov asked another teacher to relieve her so she could take a bathroom break. (*Id.* ¶ 90.) The teacher refused, stating that he did not want to get in trouble with Izzo. (*Id.*) Plaintiffs allege that Reznikov was shaking so badly from not taking bathroom breaks that doctors could not perform a procedure on her later that day. (*Id.* ¶ 91.)

Plaintiffs also allege that Defendants made repeated remarks about Reznikov's Russian accent. In February 2014, O'Mahoney and other school administrators asked Reznikov's students questions like, "Do you understand her?" and "Does her accent seem unpleasant to you?" (*Id.* ¶ 67.) On March 13, 2014, while discussing students who spoke English as a second language, assistant principal Mario Ford stated, "We can improve the kids, but we can't improve the teachers, although we don't want them, there is nothing we can do about it." (*Id.* ¶ 73.) Plaintiffs allege that it was clear to Reznikov that Ford was referring to her. (*Id.*)

An evaluation dated February 25, 2014, criticized Reznikov for not using her computer or smart board during a lesson, despite the fact that her classroom was not equipped with that technology. (*Id.* ¶ 65.) At a post-observation conference on March 4, 2014, O'Mahoney leaned over his desk and told Reznikov, "You are the worst teacher in this school. I want you to leave this school and leave this profession. You are a disgrace." (*Id.* ¶ 70.) When Reznikov responded that her students were passing their exams, O'Mahoney yelled that she should not talk when he was talking. (*Id.*) Reznikov was so upset that she could barely walk, and Lebowitz had to help her walk back to her classroom. (*Id.*) The next day, O'Mahoney gave Reznikov a rating of "ineffective" for his observation of her, which Plaintiffs contend was baseless. (*Id.* ¶ 71.) In April 2014, the state conducted observations of SBHS. (*Id.* ¶ 78.) The administration assured the teachers that they would not be subject to simultaneous internal observations by school leadership while the state observations were in progress. (*Id.*) Izzo observed Reznikov anyway. (*Id.*) When Reznikov asked Izzo why she had conducted the observation at that time, Izzo responded, "I did that because I want all the senior teachers out of here." (*Id.*) In June 2014, Izzo rated Reznikov as "ineffective," without having any basis for doing so. (*Id.* ¶ 85.)

On June 26, 2014, which Plaintiffs allege was Reznikov's last day at SBHS, Izzo invited Reznikov and her union representative to Izzo's office. (*Id.* ¶ 93.) Izzo informed Reznikov that she would receive a disciplinary letter for taking an hour for lunch instead of the allotted forty-two minutes. (*Id.*) When Reznikov stated that the accusation was untrue, Izzo replied, "Fact or no fact, you are going to be rated ineffective, you are going to lose your license." (*Id.*) Reznikov remarked, "You just don't want me to be alive," to which Izzo responded, "Exactly." (*Id.*) Later that day, when Reznikov received a copy of her file, she noticed that all of her letters of commendation were missing. (*Id.* ¶ 94.) Reznikov received an overall ineffective rating for the 2013-2014 school year at SBHS and was placed on ATR. (*Id.* ¶ 95.) During the 2014-2015 school year, Reznikov taught at Franklin Delano Roosevelt high school and received a rating of "highly effective." (*Id.*) In June 2015, Reznikov was returned to ATR. (*Id.*)

### III. Allegations as to Plaintiff Black

Plaintiff Keith Black is a forty-eight-year-old male who has taught mathematics at SBHS since 1999. (*Id.* ¶¶ 98-99.) In 2012, Black requested FMLA leave to care for his ailing mother. (*Id.* ¶ 103.) Defendants approved Black's request for leave from February 13, 2012, through June 30, 2012. (*Id.*) Black returned for the fall 2012 semester. (*Id.* ¶ 108.) On December 5, 2012, Black received a review of "satisfactory" following a formal observation. (*Id.* ¶ 110.) On January 3, 2013, Black received a negative evaluation, which Plaintiffs contend was baseless. (*Id.* ¶ 111.) As a result, Black began to suffer from severe anxiety and panic attacks, which required him to stay out of school for three weeks, using his accrued sick days. (*Id.* ¶¶ 112-13.) On March 20, 2013, Black received correspondence from O'Mahoney stating that Black must either provide O'Mahoney with medical documentation, return to work immediately, or resign. (*Id.* ¶ 115.) Plaintiffs allege that, after Black returned to work from this period of sick leave,

O'Mahoney "consistently harassed Black and disciplined or attempted to discipline Black for falsified and baseless reasons." (*Id.* ¶ 120.) Plaintiffs allege that in May 2013, O'Mahoney told another teacher that he would "get Black the following year" because Black "[knew] how to beat the system." (*Id.* ¶ 125.) The next year, O'Mahoney gave Black ten ineffective ratings. (*Id.* ¶ 131.) Similarly, Izzo gave Black poor ratings, which Plaintiffs contend "had no basis in fact and could not be supported." (*Id.* ¶ 139.)

Plaintiffs allege that O'Mahoney went out of his way to humiliate Black, and that "[s]imilarly situated younger teachers and those teachers who did not take FMLA leave were not humiliated." (*Id.* ¶ 133.) Plaintiffs allege that "O'Mahoney's plan to mentally and emotionally break the senior teachers was taking its toll on Black" and that Black was ultimately diagnosed with Post-Traumatic Stress Disorder ("PTSD"). (*Id.* ¶ 136.) Black and numerous other staff members were "subjected to looks of disdain and disgust from O'Mahoney, who did not show this contempt to similarly situated younger teachers and staff." (*Id.* ¶ 141.) In the spring of 2014, Black made several requests to be transferred out of SBHS. (*Id.* ¶ 145.) Those requests were denied. (*Id.*) In June 2014, Black was "excessed" out of SBHS, but then was sent back to teach at SBHS for the 2014-2015 school year. (*Id.* ¶¶ 146, 150.) Black took medical leave beginning in February 2015 to address his anxiety and PTSD. (*Id.* ¶¶ 150-51.) On May 4, 2015, O'Mahoney allegedly sent an investigator to Black's house to confirm that he was, indeed, ill and not engaging in outside work. (*Id.* ¶ 155.) The investigation was later dropped. (*Id.*) Ultimately, in June 2015, Black was informed that he would be excessed from SBHS for the 2015-2016 school year. (*Id.* ¶ 156.)

**STANDARD OF REVIEW**

To withstand a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id*. Although this standard requires more than a "sheer possibility" of defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the court must accept the factual allegations of the complaint as true." *Id*. (internal citation omitted).

**DISCUSSION**

**I.      Plaintiffs' Age Discrimination Claims**

A.   <u>Age Discrimination under the ADEA and NYSHRL</u>

Under the ADEA and NYSHRL, a prima facie case of age discrimination consists of four elements: (1) the plaintiff's membership in a protected class; (2) the plaintiff's qualification for a particular position of employment; (3) an adverse employment action by the defendant employer; and (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (outlining prima facie case of employment discrimination). However, the complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss. *Alleyne v. NAACP Legal Defense and Educ. Fund, Inc.*, No. 14-cv-6675, 2015 WL 6869731, at *2 (E.D.N.Y. Nov. 6, 2015) (collecting cases). Instead, a plaintiff need only plead

10

facts to give plausible support to his or her claim. *See id.* At the pleading stage, a plaintiff

alleging employment discrimination must allege that the employer took adverse action against

him or her at least in part for a discriminatory reason.[3] *Vega v. Hempstead Union Free Sch.*

*Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). He or she may do so either directly, by alleging facts that

show an intent to discriminate, or indirectly, by alleging circumstances that give rise to a

plausible inference of discrimination. *Id.*

### 1. Adverse Employment Action

Defendants argue that dismissal is warranted because Plaintiffs have not sufficiently

alleged that they suffered any adverse employment action. (*See* Defs.' Mot. 6-7, ECF No. 36.)

A plaintiff sustains an adverse employment action if he or she endures a materially adverse

change in the terms and conditions of employment. *Vega*, 801 F.3d at 85. Such a change must

be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*

(citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). Common examples of materially

adverse changes include termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, significantly diminished

material responsibilities, or other indices unique to a particular situation. *Id.*

Here, Plaintiffs allege a number of purportedly adverse actions. Plaintiffs rely

principally, however, on the allegation that they each received negative evaluations from their

supervisors. (*See* Pls.' Opp'n 4-10.) Criticism of an employee in the course of evaluating and

correcting his or her work is not, in and of itself, a materially adverse employment action.

---

[3] As discussed in further detail below, to plead a claim of age discrimination under the ADEA and NYSHRL, a
plaintiff must also plausibly allege that age was the "but for" cause of the adverse employment action. *See, e.g.*,
*Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (explaining that at the pleading
stage, a plaintiff alleging age discrimination need not show that age was the only cause of discrimination, but that
the plaintiff must show that the adverse action could not have occurred without the consideration of age).

*Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 213 (E.D.N.Y. 2014) (citing *Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001). And, "a thin-skinned worker's reaction to such criticism will not support a claim of age discrimination." *Id.* (collecting cases holding that an unsatisfactory evaluation alone does not constitute an adverse employment action). Negative evaluations may be adverse, however, if they trigger other negative consequences in the terms and conditions of a plaintiff's employment. *Id.* (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002)).

With respect to Lebowitz, Plaintiffs allege that negative evaluations prevented him from applying to additional positions within the DOE, including "after school jobs, tutoring, or college teaching," and hampered his ability to find another job. (Compl. ¶ 49.) This sort of "per session" employment could potentially be considered a materially adverse change. *See Dimitracopoulos*, 26 F. Supp. 3d at 214 (allowing ADEA discrimination claim to proceed where negative evaluation letter led to loss of per session assignments). Such a charge, however, must go beyond mere speculation. *See Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 470 (S.D.N.Y. 2013) (finding that a negative review was not adverse where teacher argued she would have been terminated if she had not retired first). Lebowitz does not allege that he ever applied for other employment, rendering speculative his claim that he was denied other potential work opportunities.

Unlike Lebowitz, Black and Reznikov allege that their negative evaluations actually led to concrete adverse consequences. (Compl. ¶¶ 93, 95, 146, 156.) Reznikov was placed on ATR after receiving an ineffective overall rating for the 2013-2014 school year and again on in June 2015. (Compl. ¶¶ 93, 95.) Similarly, Black was twice excessed from the school. (*Id.* ¶¶ 146, 156.) Placement on ATR and being excessed from a teaching position have been construed to be

adverse employment actions.[4]  *See Saunders v. New York City Dep't of Educ.*, No. 07-cv-2725,

2010 WL 2816321, at *25, 27 (E.D.N.Y. July 15, 2010) (finding ATR assignment to be adverse

employment action in discrimination and retaliation contexts and construing "excessing" as

adverse employment action).  As such, these allegations suffice to plead an adverse employment

action.

Plaintiffs also maintain that the denials of Black's requests to be transferred to another

school were adverse employment actions.  (Pls.'s Mem. Supp. 8 (citing Compl. ¶ 146).)  A

denial of a request for transfer indeed may constitute an adverse employment action when "an

employee is forced to move to or to stay in a unit with more cumbersome job responsibilities or

lower compensation." *Taylor v. N.Y. City Dep't of Educ.*, No. 11-cv-3582, 2012 WL 5989874, at

*8 (E.D.N.Y. Nov. 30, 2012) (quoting *Pimentel v. City of New York,* 74 F. App'x 146, 148 (2d

Cir. 2003)).  Such a denial does not constitute an adverse employment action, however, "if the

terms, privileges, duration, or condition of a plaintiff's employment do not change." *Id.*  Black

purportedly sought a transfer because his continued placement at SBHS caused him anxiety and

distress.  (*See* Compl. ¶ 145.)  He alleges no facts that would indicate what effect, if any, such a

transfer would have on the terms and conditions of his employment.  There is no allegation, for

example, that his responsibilities would have been altered or that his compensation would have

been increased. *Cf. Taylor*, 2012 WL 5989874, at *8.  Accordingly, the Court declines to find

that the alleged denials of Black's requests for a transfer were adverse employment actions.

The other actions that Defendants purportedly took against Plaintiffs similarly fail to rise

to the level of adverse employment actions.  For example, Defendants' conduct in assigning

---

[4] Defendants argue that, because SBHS closed at the end of the 2015-2016 school year, all SBHS teachers were
ultimately "excessed to the ATR."  (Defs.' Mem. Supp. 8.)  The Court finds that this issue is more appropriately
resolved on summary judgment.

Black and Lebowitz to teach certain math classes in violation of the collective bargaining agreement, denying Black and Lebowitz desired cafeteria duty, and denying Lebowitz a desired ICT classroom position in violation of the collective bargaining agreement were not adverse. *See Dimitracopoulos*, 26 F. Supp. 3d at 213 (finding that scheduling and assignment issues involving course loads are generally not materially adverse employment actions unless they are so burdensome as to constitute a departure from normal academic practice and that assignments that violate a collective bargaining agreement are "garden-variety academic organizational changes, grievable under union agreements").  Nor do disciplinary memoranda or the circulation of the TIP list amount to adverse employment actions.  *See Campbell v. New York City Transit Auth.*, 93 F. Supp. 3d 148, 168 (E.D.N.Y. 2015).  "[D]isciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotion, wages, or termination."  *Regis v. Metro. Jewish Geriatric Ctr.*, No. 97-cv-0906, 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000) (citing *Johnson v. Frank*, 828 F. Supp. 1143, 1153 (S.D.N.Y. 1993).

In light of the foregoing, the only adverse employment actions at issue are Reznikov's placement on ATR and Black's being "excessed" from SBHS.

### 2.  Discriminatory Motive

To bring a successful claim of age discrimination under the ADEA, a plaintiff must demonstrate, among other things, that age was the "but-for" cause of the challenged action.  *See Bohnet v. Valley Stream Union Free Sch. Dist.*, 30 F. Supp. 3d 174, 180 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 53 (2d Cir. 2015) (citing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009)).  Defendants argue that Plaintiffs have failed to do so.  (Defs.' Mem. Supp. 11-12, ECF No. 36-1.)  However, at the motion to dismiss stage, a complaint need not allege that age was the

employer's only consideration, but rather that the adverse employment action would not have occurred without it. *Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (citing *Gross*, 557 U.S. at 176); *see also Bohnet*, 30 F. Supp. 3d at 180 (explaining that the complaint need only allege sufficient facts to make plausible the conclusion that a plaintiff would not have endured an adverse employment action "but for" her age). In addition, the Second Circuit has "assumed, without deciding, that the [ADEA's requirement of] but-for causation is also required under the NYSHRL for age discrimination claims . . . ." *See, e.g.*, *Szewczyk v. City of New York*, No. 15-cv-918, 2016 WL 3920216, at *9 n. 8 (E.D.N.Y. July 14, 2016) (citations omitted). Defendants maintain that Plaintiffs fail to meet this standard. (Defs.' Mem. Supp. 11-12.)

Plaintiffs make a number of statements that plausibly allege that age was the but-for cause behind Reznikov and Black's ATR status. The Complaint contains numerous allegations of Izzo stating that she wanted to rid the school of senior teachers. For example, Plaintiffs allege that Izzo stated, "We don't want senior teachers here with your stale methods. I just don't want any senior teachers in this department and this school, period." (Compl. ¶ 60.) Similarly, when Reznikov asked Izzo when the teachers would receive their Regents exam preparation books for their classes, Izzo responded, "You are not going to get them. When all the senior teachers are gone next year, Ms. Castillo will get the books." (*Id.* ¶ 84.) Black alleges that he received a negative evaluation with respect to the physical appearance of a classroom that he shared with a younger teacher, Mr. Vidal. (*Id.* ¶ 131.) Despite sharing the same space with Black, Mr. Vidal did not receive a negative evaluation with respect to the classroom's appearance. (*Id.*) Although these allegations do not rise to the level of adverse employment actions, they nevertheless support an inference of discrimination. *See Littlejohn*, 795 F.3d at 312 ("An inference of

discrimination can rise from circumstances including, but not limited to . . . invidious comments about others in the employee's protected group[] or the more favorable treatment of employees not in the protected group . . . ." (internal quotation marks omitted)).  Accordingly, Plaintiffs have sufficiently pleaded a claim of age discrimination under the ADEA and NYSHRL as to Black and Reznikov.

B. <u>NYCHRL Age Discrimination Claim</u>

The pleading standard for a discrimination claim under the NYCHRL is far more liberal than for federal and state discrimination claims.  As such, courts analyze NYCHRL claims "separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Thomson v. Odyssey House*, No. 14-cv-3857, 2015 WL 5561209, at *24 (E.D.N.Y. Sept. 21, 2015) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).  To state a claim for discrimination under the NYCHRL, a plaintiff need only show differential treatment of any degree based on a discriminatory motive. *Id.* (citing *Gorokhovsky v. N.Y.S. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014)); *accord Awad v. City of New York*, No. 13-cv-5753, 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014).  The NYCHRL requires neither a materially adverse employment action, nor severe and pervasive conduct. *Awad*, 2014 WL 1814114, at *5.  However, even under this more liberal pleading standard, a plaintiff must still plausibly allege that he or she was subjected to unequal treatment because of a protected characteristic. *Thomson*, 2015 WL 5561209, at *24.

The Complaint makes frequent reference to the way Defendants treated Plaintiffs differently from younger teachers, including, among other things, giving younger teachers more lenient evaluations, providing younger teachers with better supplies and resources, and telling

younger teachers to be mean to the senior teachers.  (Compl. ¶¶ 26-27, 56, 66, 76.)  The Complaint also alleges overt statements by Defendants regarding their desire to rid the school of older teachers.  (*Id.* ¶¶ 40, 78.)  Because Plaintiffs must merely allege differential treatment of any degree, all three Plaintiffs have pleaded an age discrimination claim under the NYCHRL.

## II.      Reznikov's Additional Discrimination Claims

### A.  Reznikov's Disability Discrimination Claims

#### 1.  Exhaustion of Remedies under the ADA

As a threshold matter, Defendants argue that Reznikov's ADA discrimination claims must be dismissed for failure to exhaust her administrative remedies.  (Defs.' Mem. Supp. 3-5.)  As a condition precedent to bringing a claim under the ADA, a plaintiff must show that she exhausted her administrative remedies.  *See Benjamin v. Brookhaven Science Assocs., LLC*, 387 F. Supp. 2d 146, 154-55 (E.D.N.Y. 2005) (explaining exhaustion of remedies requirement in ADA context).  A plaintiff may do so by pleading the claims at issue in a charge before the Equal Employment Opportunity Commission ("EEOC").  *See id.*; *see also Stewart v. U.S. I.N.S.*, 762 F.2d 193, 198 (2d Cir. 1985) ("[T]he purpose of the exhaustion requirement . . . is to give the administrative agency the opportunity to investigate, mediate, and take remedial action . . . .").  However, claims not explicitly pleaded in an EEOC charge nevertheless may be brought in federal court if they are "reasonably related" to the claim filed with the agency.  *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)).  The Second Circuit has deemed federal claims to be "reasonably related" to the claims in an EEOC charge when those claims are within the scope of the EEOC investigation likely to result from the EEOC charge.  *Hurt v.*

*Donahoe*, No. 07-cv-4201, at *3 (E.D.N.Y. Feb. 24, 2011) (citing *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993)).

When determining whether claims are reasonably related, the focus should be "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2004) (quoting *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)). Although merely checking a box on the EEOC form charge identifying the basis of the charge does not necessarily control the scope of an EEOC charge, the absence of a checkmark weighs against concluding that the plaintiff has alleged discrimination on the basis of the claim designated by that box. *See Holmes v. Fresh Direct*, No. 13-cv-46757, 2015 WL 4885216, at *5-6 (E.D.N.Y. Aug. 5, 2015) (dismissing with prejudice claims of race discrimination, gender discrimination, and retaliation, where plaintiff's EEOC charge of disability discrimination was devoid of any reference to race or gender discrimination or retaliation); *cf. Williams*, 458 F.3d at 71 (finding that a claim of sexual harassment was reasonably related to retaliation claim filed with EEOC where, even though plaintiff did not check box marked "sex" in EEOC charge of discrimination, the EEOC complaint's descriptions of sexually harassing conduct were sufficient to put the EEOC on notice of a potential sex discrimination claim).

Here, in her October 28, 2014 EEOC charge, Reznikov left blank the box that would have indicated that she brought her claim pursuant to the ADA and failed to check the "disability" box in the categories of "circumstances of discrimination" and "cause of discrimination." (Defs.' Mem. Supp., Ex. C. ("Reznikov EEOC Charge"), at 1, ECF No. 36-5.) Reznikov's failure to select "ADA" or "disability" at these three junctures in her intake form weighs against a finding that she brought her disability claim before the EEOC. *See Holmes*, 2015 WL 4885216, at *5.

However, Reznikov's written narrative to her EEOC charge contains factual allegations that are nearly identical to those in Plaintiffs' federal complaint. (*Compare, e.g.*, Reznikov EEOC Charge 7-8, *with* Compl. ¶¶ 60, 63, 79, 83.) When a claim in a federal complaint is "simply a newly articulated cause of action that grows directly out of the factual allegations of the EEOC charge, the claim can be brought in district court." *Benjamin*, 387 F. Supp. 2d at 154 (citation omitted). Accordingly, Reznikov's ADA discrimination claim is reasonably related to her EEOC complaint, and Reznikov did not fail to exhaust her administrative remedies as to this claim.

2. Reznikov's Substantive Disability Discrimination Claims

To survive Defendants' motion to dismiss her ADA, NYSHRL, and NYCHRL disability discrimination claims, Reznikov must allege facts to show that her employer took adverse action against her, and that the action was taken because of her disability or perceived disability. *Thomson*, 2015 WL 5561209, at *16, *18 (articulating pleading standard under ADA and applying same to NYSHRL and NYCHRL claims). As to this claim, there is little in the Complaint to support that the adverse action in question here—Reznikov's placement on ATR—was at all related to her perceived disability. Reznikov alleges that she took four days off to seek treatment for a condition that was "suspected to be cancer." (*Id.* ¶ 60.) The Complaint's only reference to any mention of Reznikov's health condition is Izzo's statement that Reznikov reminded her of her mother, who "had cancer" but "never died," and Izzo's exclamation of "Oh, die already!" in response to Reznikov's statement that she needed her health benefits for her cancer. (*Id.* ¶¶ 79, 83.) These allegations do not support the inference that Reznikov was placed on ATR because of her perceived disability, and there are no other allegations in the Complaint from which the Court may draw such an inference.

To the extent that Reznikov's disability discrimination claim is premised on a theory of a

failure to accommodate Reznikov's perceived disability, such a claim also fails. A plaintiff pleads a claim of discrimination on a failure to accommodate theory under the ADA, NYSHRL, and NYCHRL where she alleges: (1) that she was a person with a disability within the meaning of the statute; (2) her employer is a covered entity; (3) the plaintiff could perform the essential functions of her job with an accommodation; and (4) the defendant refused to make such an accommodation. *Thomson*, 2015 WL 5561209, at *18 (citing *McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013)) (articulating ADA pleading standard and finding that single allegation did not give rise to plausible inference of failure to accommodate); *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 366 (S.D.N.Y. 2016) (applying similar standard to NYSHRL and NYCHRL disability discrimination claims).

Reznikov premises her ADA failure to accommodate claims on Defendants' refusal to allow her to use the bathroom while proctoring Regents exams and Izzo's apparent refusal to allow Plaintiff to attend a biopsy appointment that conflicted with a meeting. (*See* Compl. ¶¶ 79, 86-91.) As to Defendants' refusal to allow Reznikov to use the bathroom, the Complaint is devoid of any facts that would indicate that Reznikov's perceived cancer was in any way related to her need for restroom breaks or that Defendants were aware that Reznikov needed such breaks as an accommodation for her perceived condition. Further, the Court notes that it was a fellow teacher, not Defendants, who declined to relieve Reznikov. (*Id.* ¶ 90.) As to the biopsy procedure that conflicted with a meeting with Izzo, there is no allegation that Izzo prevented Reznikov from attending her biopsy. (*Id.* ¶ 79.) Rather, Reznikov alleges only that Izzo informed her that she would need to find out what she missed at the meeting. (*Id.*) Although perhaps insensitive, this allegation leads to the reasonable inference that Izzo did not hinder Reznikov from attending her biopsy. Because Reznikov does not plead facts demonstrating that

Defendants failed to accommodate her perceived disability, Reznikov's ADA, NYSHRL, and NYCHRL disability discrimination claims are dismissed.

B. Reznikov's National Origin Discrimination Claim

Defendants also move to dismiss Reznikov's national origin discrimination claim. Plaintiffs allege several instances in which school administrators made reference to Reznikov's Russian accent, which Reznikov perceived to be insulting. Such stray remarks, however, "even if made by a decisionmaker, 'without more, cannot get a discrimination suit to a jury.'" *Baffa v. STAT Health Immediate Medical Care, P.C.*, No. 11-cv-4709, 2013 WL 5234231, at *12 (E.D.N.Y. Sept. 17, 2013) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)). Plaintiffs fail to plead any additional facts that would suggest that Defendants placed Reznikov on ATR because she is Russian. Accordingly, Reznikov's Title VII and NYSHRL national origin discrimination claims are dismissed. *See Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 250 (E.D.N.Y. 2015) (dismissing Title VII and NYSHRL national origin discrimination claims where complaint failed to allege that adverse action occurred because of national origin). Similarly, despite the NYCHRL's more "lenient standard" for pleading discrimination claims, Plaintiffs have not sufficiently pleaded national origin discrimination under the NYCHRL because they have not demonstrated that Defendants treated Reznikov less well than other teachers in a manner indicating that Defendants were motivated by animus based on Reznikov's national origin. *See id.* at 241, 250 (finding that comments including "oh another Russkee," "you Russians are taking over everything," and "Russians get everything handed to them" did not support national origin discrimination claim under NYCHRL). Accordingly, Reznikov's national origin discrimination claims are dismissed in their entirety.

### III.    Plaintiffs' Retaliation Claims

#### A.  Retaliation under ADEA, NYSHRL, and NYCHRL

To establish a prima facie case of retaliation under the ADEA, NYSHRL, and NYCHRL, a Plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Thomson*, 2015 WL 5561209, at *19 (E.D.N.Y. Sept. 21, 2015) (quoting *Littlejohn*, 795 F.3d at 316).  *See also Muktadir v. Bevacco Inc.*, No. 12-cv-2184, 2013 WL 4095411, at *3 (E.D.N.Y. Aug. 13, 2013) (pleading standard the same under Title VII, NYSHRL, and NYCHRL); *Bohnet v. Valley Stream Union Free Sch. Dist. 13*, 30 F. Supp. 3d 174, 181-82 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 53 (2d Cir. 2015) (claims of retaliation under the ADEA analyzed under same standard as Title VII).

Plaintiffs allege that their union filed a grievance against the DOE in May 2012 when the senior teachers were forced to reapply for their jobs and were not rehired.[5]  (*See* Compl. ¶¶ 17-18.)  In addition, Plaintiffs allege that they "repeatedly complained to Defendants about the discriminatory treatment that they endured because of their age." (Compl. ¶ 166.)  These types of complaints are protected activity.  *See Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 723 (E.D.N.Y. 2015) (collecting cases and observing that informal complaints of discrimination to management are protected activity under Title VII and the ADEA).  Even still, Defendants argue that Plaintiffs fail to plead any retaliation claim because there was no adverse employment action.  (Defs.' Mem. Supp. 7.)

---

[5] Although the Complaint explicitly states that Lebowitz was not rehired, it does not specifically identify Reznikov or Black as being part of that group.  However, because Plaintiffs allege that Defendants did not re-hire "any" of the older teachers, the Court will construe this group to include Reznikov and Black.

Courts in the Second Circuit have taken a "generous" view of adverse employment actions supporting retaliation claims at the motion to dismiss stage. *Ingrassia*, 130 F. Supp. 3d at 723 (citing *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013)). "Any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination' may constitute retaliation." *Id.* at 724 (quoting *LaGrande v. Decrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010)). This generous standard does not mean, however, that all allegations of retaliatory acts will survive a motion to dismiss.

In their second enumerated cause of action Plaintiffs state in a wholly conclusory manner that they complained to Defendants about the discriminatory treatment they received and that the Defendants "intensified the harassment and discrimination." (Compl. ¶ 166.) Plaintiffs fail to include any specific facts as to when or how the Defendants' conduct intensified. Nor do Plaintiffs include any specific facts linking their complaints to any retaliatory acts. *See Buckley v. New York*, 959 F. Supp. 2d 282, 299 (E.D.N.Y. 2013) (dismissing retaliation claim where plaintiff failed to plead a "ratcheting up" or "increased harassment" beyond mere vague conclusory allegations).

Plaintiffs do not, for example, allege that they were treated differently than employees who engaged in similar protected conduct. *Cf. Corbett v. Napolitano*, 897 F. Supp. 2d 96, 114 (E.D.N.Y. 2012) (noting favorably allegation that employees outside of plaintiff's protected class did not face adverse employment actions for engaging in same activity as plaintiff). Nor do Plaintiffs allege any statements by Defendants referring to—let alone condemning—the Plaintiffs' protected activity. *See Azeez v. Ramaiah*, No. 14-cv-5623, 2015 WL 1637871, at *9 (S.D.N.Y. Apr. 9, 2015) (finding that failure to allege that defendants made statements referring to plaintiff's protected activity underscored absence of retaliatory animus). Nor do Plaintiffs

allege that Defendants admitted that they took an adverse action against Plaintiffs for improper reasons. *Cf. Stajic v. City of New York*, No. 16-cv-1258, 2016 WL 5717573, at *5 (S.D.N.Y. Sept. 30, 2016) (finding that defendants' alleged statements that plaintiff's termination was unrelated to the quality of her work were plausibly indicative of retaliatory animus). Similarly, although Lebowitz filed two grievances in September 2014 regarding his denial of his desired ICT position and cafeteria duty, nothing in the Complaint indicates that any action was taken in retaliation for those grievances. Indeed, Lebowitz ultimately received the positions he desired. (Compl. ¶¶ 32, 35.) Accordingly, Plaintiffs' ADEA, NYSHRL, and NYCHRL retaliation claims are dismissed. *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 241-42 (2d Cir. 2007) ("Notably, the complaint fails to identify any specific acts by defendants against [plaintiff] that are alleged to have been taken in retaliation for [plaintiff's] complaints or for her filing of discrimination charges with the EEOC . . . . We conclude, therefore, that the complaint fails to state a retaliation claim on behalf of [plaintiff] under the ADEA, the NYSHRL, or the NYCHRL.").

B. Black's FMLA Retaliation Claim

To state an FMLA retaliation claim, Black must plead facts alleging that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *See Vaigasi v. Solow Mgmt. Corp*, No. 11-cv-5088, 2014 WL 1259616, at *12 (S.D.N.Y. Mar. 24, 2014) (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)).

Black does not plausibly allege a claim of retaliation under the FMLA because he fails to establish a causal connection between his FMLA leave and any purported adverse action taken

against him.  A plaintiff may establish a causal connection between protected activity and an

adverse action either directly, by pleading facts showing demonstrating retaliatory animus

directed against the plaintiff by the defendant, or indirectly, by showing that the protected

activity was followed closely by discriminatory treatment or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct.  *See*

*Robles v. Cox and Co., Inc.*, 841 F. Supp. 2d 615, 628 (E.D.N.Y. 2012) (outlining pleading

standard for retaliation claim under Title VII); *Corrado v. New York Unified Court Sys.*, No. 12-

cv-1748, 2016 WL 660838, at * 17 (E.D.N.Y. Feb. 17, 2016) (applying Title VII standard to

FMLA retaliation claim).

*First*, Black fails to provide direct evidence of retaliatory animus.  Specifically,

O'Mahoney's comments to a third party in May 2013 that he was going to "get" Black and that

Black knew how to "beat the system" (Compl. ¶ 125), while provocative, do not directly address

Black's FMLA leave.[6]  Further, although Assistant Principal Ford threatened to give Black a

disciplinary letter for his repeated spring absences (*id.* ¶ 124), there is no mention as to whether a

disciplinary letter was ever issued for this reason.  Although a disciplinary letter may constitute

an adverse employment action in the retaliation context, *Thomson*, 2015 WL 5561209, at *21,

the facts of the Complaint indicate that the hypothetical disciplinary letter would have been in

response to Black's repeated absences, and not to his FMLA leave.

---

[6] The Court does not construe Black's sick leave in the spring of 2013 as FMLA leave.  Black states that he used his accrued sick days during that absence.  (*See* Compl. ¶ 113.)  The use of paid sick leave is outside the scope of the FMLA's coverage.  *See Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 194 (S.D.N.Y. 2011) (distinguishing sick days from FMLA leave).  Plaintiffs also do not plead facts indicating Black's leave in February 2015 falls under the FMLA.  Accordingly, the court cannot determine whether Black "exercised rights protected under the FMLA" as required to withstand a 12(b)(6) motion.  *See Vaigasi*, 2014 WL 1259616, at *12.  Further, the Court notes that Plaintiffs' fifth cause of action for FMLA retaliation limits Black's FMLA leave to the time he took to care for his mother.  (*See* Compl. ¶ 183.)

*Second*, the length of time between Black's FMLA leave in the spring of 2012 and any alleged adverse act is temporally too remote to indirectly demonstrate a causal connection. *See Alexander v. Bd. Of Educ. Of City of New York*, No. 15-1959, 2016 WL 2610009, at *2 (2d Cir. May 6, 2016) (finding that plaintiff could not plausibly allege retaliatory intent because of the length of time between plaintiff's FMLA leave and discharge); *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (observing that although there is no bright line as to how much time may pass, "the interval between a protected activity and adverse action that results in a finding of retaliation is generally no more than several months"). Moreover, the facts as pleaded demonstrate that Black received a satisfactory review in December 2012 after his return to SBHS from FMLA leave, before subsequently receiving a negative review in January 2013. (*See* Compl. ¶¶ 110-11.) Such a positive review disrupts the causal connection between Black's FMLA leave and any subsequent purported adverse conduct. *See Dayes v. Pace University*, 2 F. App'x 204, 208 (2d Cir. 2001) (summary order) (finding no causal connection in a Title VII action where seven months lapsed between protected activity and a negative review, "especially given [supervisor's] intervening positive review"). Finally, the Complaint contains no facts that indicate that any other teachers took FMLA leave, and as such, Plaintiff cannot establish a causal connection by demonstrating that he was treated differently than other teachers engaging in the same protected activity. *See Robles*, 841 F. Supp. 2d at 628. Accordingly, Black's FMLA retaliation claim is dismissed.

## IV. Intentional Infliction of Emotional Distress

To plead a claim of intentional infliction of emotional distress, a plaintiff must allege: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct

and the injury; and (4) severe emotional distress." *Conboy v. AT&T Corp.*, 241 F.3d 242, 258-59 (2d Cir. 2001) (quoting *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir. 1999)). This standard is "rigorous, and difficult to satisfy." *Corrado v. New York Unified Court Sys.*, No. 12-cv-1748, 2016 WL 660838, at \*19 (E.D.N.Y. Feb. 17, 2016) (quoting *Conboy*, 241 F.3d at 258). To sustain a claim, "the alleged conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society.'" *Corrado*, 2016 WL 660838, at \*19 (quoting *Stuto*, 164 F.3d at 827).

Thus, "it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Stuto*, 164 F.3d at 827 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The Second Circuit has looked to decisions from New York state courts for guidance as to what rises to the level of intentional infliction of emotional distress, sustaining such claims where the pleadings involved some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or actions contrary to public policy. *Id.* at 828 (collecting cases). Examples of such egregious conduct include refusing to restore a plaintiff's electricity unless she legally separated from her husband; threatening to bring falsified charges against a professor to coerce his resignation; coercing a confession and resignation through the threat of prosecution; falsely accusing a person of criminal conduct; falsely accusing someone of being responsible for an accident that resulted in another person's death; and making recurring physical threats. *Id.* (collecting cases).

In contrast, other cases have dismissed claims of IIED involving acts of coercion and misrepresentation related to employment or disability decisions on the ground that such conduct was not extreme or outrageous.  As the court noted in *Stuto*, conduct fell fall short of the tort's "strict standard" where a state court plaintiff alleged a variety of conduct including being transferred and demoted for reporting fraud, coerced to leave his job by being told he would never be allowed to advance, discharged and ordered to leave immediately after reporting alleged in-house illegal conduct, and forcibly escorted from the building by guards.  *Id.* at 827 (citing *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983)).  The *Stuto* court also cited with approval *Huzar v. New York*, in which the New York Court of Claims determined that a correction officer out on disability failed to state a claim for intentional infliction of emotional distress where he was threatened that he would be fired if he did not return to work despite a legitimate job-related disability that kept him from working and was threatened with the loss of his compensation and medical benefits.  *Id.* at 828 (citing *Huzar v. New York*, 156 Misc. 2d 370 (N.Y. Ct. Cl. 1992)).

Here, Plaintiffs allege that they were subjected to negative evaluations and rude and vindictive comments, such as being told that they were in their "f\*\*k you years" earning "f\*\*k you money"  and to "die already," and that they were repeatedly told that Defendants wanted to rid the school of senior teachers.  (*See* Compl. ¶¶ 21, 40, 78, 83.)  At one point, Reznikov felt so bullied that she could barely walk.  (*Id.* ¶ 70.)  Such conduct, while certainly insulting and inappropriate, simply does not rise to the level of "outrageous."  Accordingly, Defendants' motion to dismiss Plaintiffs' claims of intentional infliction of emotional distress is granted.

## V.     Hostile Work Environment

The Complaint, which is fifty pages long and which has been amended three times, does not plead a discrete hostile work environment claim. However, Plaintiffs state throughout the Complaint that they were subjected to a hostile work environment, and at a June 2, 2016 pre-motion conference in this case, Plaintiffs argued that the Court should construe the Complaint as alleging a hostile work environment claim. Defendants move to dismiss Plaintiffs' hostile work environment claims under federal, state, and city law to the extent the Court discerns them. (Defs.' Mem. Supp. 9.)

### A.     Title VII, ADEA, and NYSHRL Hostile Work Environment Claims

The standards for evaluating hostile work environment claims are identical under Title VII, the ADEA, and the NYSHRL. *See Thomson*, 2015 WL 5561209, at *13 (citing *Kelly*, 716 F.3d at 14) (same standard under Title VII and the NYSHRL); *Ingrassia*, 130 F. Supp. 3d at 722 (applying Title VII pleading standard to ADEA claim). To plead a hostile work environment claim, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Thomson*, 2015 WL 5561209, at *13 (citing *Littlejohn,* 795 F.3d at 320-21). This standard has both objective and subjective components: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn,* 795 F.3d at 321 (quoting *Raspardo v. Carlone,* 770 F.3d 97, 114 (2d Cir. 2014)). A court assesses a work environment's hostility based on the totality of the circumstances. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). In assessing the totality of the circumstances, a court

might consider factors including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* As a general rule, to constitute a hostile work environment, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Isolated acts, "unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (quoting *Alfano*, 294 F.3d at 374).

      1.   Hostile Work Environment as to Reznikov

Reznikov adequately alleges a hostile work environment claim. Plaintiffs plead facts indicating that Defendants and others at SBHS repeatedly threatened her with her job and her license, told Reznikov that they wanted to rid the school of senior teachers, slammed the door in her face, told her she was a disgrace, and threatened and ultimately gave Reznikov negative ratings because she needed to leave the school system. (*See* Compl. ¶¶ 70-71, 78, 83, 85, 95.) On at least one occasion, Reznikov felt "scared and bullied to the point that she could barely walk." (*Id.* ¶ 70.) Under these facts, a reasonable person could objectively perceive the working environment to be a hostile one, and Reznikov has also pleaded facts demonstrating that she subjectively perceived it to be so. Accordingly, Reznikov's federal and state hostile work environment claims will proceed.

      2.   Hostile Work Environment as to Black and Lebowitz

Even if discriminatory behavior is not directed at a particular plaintiff, it may still contribute to an overall hostile work environment. *See Patane*, 508 F.3d at 114 (determining that

defendant's behavior contributed to hostile work environment even though it was not specifically directed toward plaintiff). Nevertheless, cases in the Second Circuit have declined to discern a claim of hostile work environment as to one plaintiff even where a hostile work environment was successfully pleaded as to another plaintiff. *See Kassner*, 496 F.3d at 241 (finding that allegations of hostile work environment as to one plaintiff warranted proceeding to discovery, whereas allegations as to second plaintiff were too vague to support a hostile work environment claim).

In contrast to the Complaint's allegations as to Reznikov, Lebowitz and Black's allegations concerning their hostile work environment claims are largely conclusory. Plaintiffs contend that older teachers were "subjected to unfounded discipline, baseless ratings, harassment, and strong-armed into retirement." (Compl. ¶ 28.) Plaintiffs also point to several discrete occurrences in which they were insulted, including being told on two or three occasions that they were in their "f**k you years" and earning "f**k you money" (*id.* ¶¶ 21, 40); being subjected to an "ongoing" joke about Lebowitz still having a job (*id.* ¶ 22); being the subject of an email to staff indicating that Lebowitz and other senior teachers were receiving teacher improvement plans, resulting in ridicule from the younger teachers (*id.* ¶ 34); and receiving a number of unsatisfactory ratings and evaluations (*e.g.*, *id.* ¶¶ 24, 30, 39, 42, 44, 111, 131, 139, 149). Plaintiffs further allege that, in response to his unfounded negative evaluations, Black suffered psychological effects including anxiety, depression, and PTSD. (*Id.* ¶¶ 112-118, 136.) Black also alleges that, while he was on medical leave in May 2015, O'Mahoney baselessly sent an investigator to Black's home to ascertain whether Black was, in fact, ill. (*Id.* ¶ 155.)

Defendants' alleged negative evaluations and criticism of Lebowitz and Black are insufficient to support a hostile work environment. *See*, *Trachtenberg*, 937 F. Supp. 2d at 472-

73 (finding pleadings were insufficient to support claim of hostile work environment where plaintiff teacher alleged that she was subjected to excessive scrutiny; that principal would frequently stand near her and stare at her to intimidate her; and that plaintiff received negative performance evaluations and letters containing "scurrilous charges," was moved to a poorly ventilated, windowless office, and was refused training opportunities).  In addition, Plaintiffs' allegations of ridicule by other teachers do not amount to anything more than "petty slight[s] and trivial inconvenience[s]," *Awad*, 2014 WL 1814114, at *7 (quoting *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 58 (1st Dep't 2012)), and Plaintiffs do not plead facts that would lead the Court to discern that such insults were severe and pervasive.  *See Alfano*, 294 F.3d at 379 (collecting cases providing examples of severe and pervasive conduct); *see also Sotomayor*, 862 F. Supp. 2d at 261 (observing that, unless very serious, incidents must be more than episodic).  Although Black alleges facts that would indicate that he subjectively perceived his work environment to be hostile, including that he experienced PTSD and anxiety, they do not plead facts showing that it was objectively so.  Accordingly, this claim is dismissed as to Lebowitz and Black.

B.  Hostile Work Environment under New York City Human Rights Law

To state a hostile work environment claim under the NYCHRL, a plaintiff need only allege differential treatment of any degree based on a discriminatory motive.  *Awad*, 2014 WL 1814114, at *7 (citing *Gorokhovsky v. N.Y.S. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014)).  "Even a single comment may be actionable under [the] NYCHRL 'in appropriate circumstances.'"  *Id.* (quoting *Gorokhovsky* 552 F. App'x at 102.)  A claim under the NYCHRL "should only be dismissed if plaintiff does not allege behavior by defendants that 'cannot be said to fall within the broad range of conduct that falls between severe and pervasive on the one hand and a petty slight or trivial inconvenience on the other.'"  *Id.* (quoting *Hernandez*, 957 N.Y.S.2d

at 58-59). Plaintiffs repeatedly allege that they were treated differently from younger teachers because of their age, including being evaluated under less advantageous circumstances, having access to fewer resources at the school, being subjected to insult and ridicule, and receiving poorer evaluations. Such differential treatment is more than a "petty slight or trivial inconvenience." Accordingly, the Court will allow Plaintiffs' claims of hostile work environment under the NYCHRL to proceed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted, in part, and denied, in part. Defendants' motion is granted as to: Lebowitz's ADEA and NYSHRL age discrimination claims; Reznikov's disability discrimination claims under the ADA, NYSHRL, and NYCHRL; Reznikov's national origin discrimination claims under Title VII, NYSHRL, and NYCHRL; Plaintiffs' retaliation claims under the ADEA, NYSHRL, and NYCHRL; Black's FMLA retaliation claim; Black and Lebowitz's federal and NYSHRL hostile work environment claims; and Plaintiffs' IIED claims. Defendants' motion is denied as to: Reznikov and Black's ADEA and NYSHRL age discrimination claims; Plaintiffs' NYCHRL age discrimination claims; Reznikov's ADEA and NYSHRL hostile work environment claims; and Plaintiffs' NYCHRL hostile work environment claims. These claims would be better tested at summary judgment.

SO ORDERED:

 /s/ LDH_____
LASHANN DEARCY HALL
United States District Judge

Dated: Brooklyn, New York
             March 31, 2017